**Lawrence R. ALBERTI et al., Plaintiffs,**

v.

**The SHERIFF OF HARRIS COUNTY, TEXAS, and the Commissioners Court of Harris County, Texas, Defendants.**

Civ. A. No. 72–H–1094.

United States District Court, S. D. Texas, Houston Division.

Dec. 16, 1975.

**5.** The Court refrains from deciding if this action "might have been brought" in the District of Columbia.

James T. Oitzinger, Gerald M. Birnberg, Houston, Tex., for plaintiffs.

Joe Resweber, County Atty., Edward J. Landry and Anthony D. Sheppard, Asst. County Attys., for defendant Commissioners Court.

Carol S. Vance, Dist. Atty., Joe Moss, Asst. Dist. Atty., Houston, Tex., for defendant sheriff.

MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

## I. INTRODUCTION

Severe and inhumane overcrowding of inmates presently exists at Harris County detention facilities. This overcrowding occurs in violation of the law and according to the record costs the taxpayers of Harris County over $1,500,000 annually in unnecessary detention.

The Court here takes an initial step to stimulate efforts to remedy overcrowding by promulgating in this Order broad guidelines within which defendants are to maintain an administrative mechanism designed to reduce the inmate population at these facilities. Such maintenance will be coordinated with efforts to streamline the criminal justice system and will be conducted in consonance with the following adjustments to the administration of the Harris County Pre-Trial Release Program: operational control of the Harris County Pre-Trial Release Agency will be transferred to the state District Judges of Harris County; an objective point system of evaluation designed by the District Judges will be utilized in determining eligibility for pre-trial release; and coordination efforts will be made with City of Houston officials to install a branch office of the Pre-Trial Release Agency in the Houston Municipal Courts Building and interview space for the agency in the Houston City Jail. Defendants will additionally take appropriate steps immediately to improve living conditions for those who must remain incarcerated in county detention facilities.

The factors which prompted this Court to order the above changes are hereafter set out in detail. To provide the necessary perspective, the Court prefaces its statement of findings with a brief recitation of the background of this lawsuit and the evidence upon which the findings are based.

## II. BACKGROUND OF THIS ORDER

Plaintiffs filed suit in this Court on August 14, 1972, against members of the Harris County Commissioners Court ("Commissioners Court") and the Harris County Sheriff's Department, alleging numerous violations of their constitutional and statutory rights as the result of defendants' operation and maintenance of county detention facilities.

### A. The Consent Judgment and the May 1 Plan

On February 4, 1975, counsel signed, and this Court approved, a Consent Judgment by which defendants generally agreed to bring presently existing facilities and operations into compliance with federal and state standards. See U.S. Const. Amends. I, V, VI, VIII, XIV; Tex.Rev.Civ.Stat.Ann. art. 5115. Pursuant to the requirements of the Consent Judgment, the defendants have submitted periodic reports on current conditions and future proposals for improvement of the county detention facilities, including a plan submitted on May 1, 1975, ("May 1 Plan") by the defendant Harris County Commissioners Court for construction and renovation of those facilities. To implement this plan, the Commissioners Court scheduled a bond election to be held on Saturday, September 27, 1975, and included a proposal on the ballot to approve the raising of bond revenues in the amount of $15,000,000, the figure projected by the Commissioners Court to represent the total dollar expenditure necessary for the Plan.

### B. The September 16 Hearing and Jail Tour

In August, 1975, plaintiffs filed a motion for supplemental relief under the Consent Judgment contending that defendants' submitted proposals were not satisfying the tenor or substance of the Consent Judgment. Plaintiffs seriously challenged the integrity of both the total cost estimate and architectural soundness of the May 1 Plan. From the skeletal outline of jail administration provided in information then available, the

Court recognized that multiple, interrelated factors contributed to overcrowding and substandard conditions at the jail, and that defendants' efforts should be measured with full appreciation of these factors. However, the Court realized that its ability to evaluate the appropriate breadth and depth of these factors was hampered by lack of data. The Court did not have sufficient evidence to ascertain whether defendants were complying fully with the mandate of the Consent Judgment.

Accordingly, on August 29, 1975, the Court ordered a hearing to be held on September 16, 1975, to permit the Court: to assess existing conditions at county detention facilities and the causes for those conditions, and to assess defendants' efforts to remedy those conditions since the entry of the Consent Judgment. *See* Order of the Court (August 29, 1975).

Commencing September 16, the Court heard extensive testimony on a variety of related subjects for six days. Then, on September 24, 1975, the Court toured the subject detention facilities, as well as the downtown detention facility of the City of Houston.

### C. Results of the September 16 Hearing: The Need to Correct Problems in "Stages"

As this Court recognized in its August 29 Order, complex interrelated factors combine to affect adversely the quality of life for jail inmates. Only an integrated, stage-by-stage approach can combat effectively this combined force and reverse the present trend of deterioration. The Court will therefore address the focal problem of overcrowding in "stages". Defendants' efforts at each stage will establish a base upon which to administer those programs in a continuing fashion while providing the foundation for efforts at the next higher stage.

The stage-by-stage approach is also the most feasible alternative from an economic standpoint. Stated simply, it does not make good business sense to build or renovate a detention facility at this stage until it is known how many inmates necessarily must be housed. This cannot be intelligently known until a sound Pre-Trial Release Program and related operational procedures have been fashioned, placed in operation and then accurately evaluated in terms of projected jail population. As local government officials in other metropolitan areas have discovered, spending additional money on pre-trial release procedures to reduce the jail population during these early stages produces substantial savings in construction and maintenance costs for physical facilities and in housing costs for the inmate population.

### D. The First Judicial Stage: Propriety of the May 1 Plan

Because of the impending September 27 bond election, the first such judicial "stage"—whether defendants properly evaluated the construction and renovation needs of the detention facilities— was quickly reached by the Court after the conclusion of the hearing. On September 25, 1975, this Court entered an Order which described the shortcomings and overall unacceptability of the May 1 Plan: the Plan did not comport with the Consent Judgment nor the requirements of applicable law; the Plan was incomplete, and many proposed changes lacked definitive architectural design; the Plan's cost estimate did not properly reflect the impact of inflation on such an estimate over the life of the building project, approximately four to five years; and even adopting the most optimistic view of inflationary trends, the estimated total cost of the Plan—$15,000,000—was inadequate to fund construction of a facility capable of fulfilling the bare essential needs of the projected number of inmates and those charged with the responsibility for housing them.

Thus, to ensure that Harris County voters were adequately informed in advance of the Plan's shortcomings, this Court ruled that the Plan was inadequate both as to estimated total cost and overall design. A properly constituted

and administered bond election was thereafter conducted on September 27, 1975, and the electorate authorized the expenditure of $15,000,000 for jail construction and renovation. This money is currently viewed as a downpayment for facilities to be built from plans to be drawn up and submitted by defendants to this Court for approval at a later stage.

## III. PRESENT AND FUTURE JUDICIAL STAGES

### A. The Second Judicial Stage

This second Order in a series of orders about the jails will concentrate upon improving the operation of the Pre-Trial Release Program, streamlining other criminal justice procedures and improving the deplorable conditions in county detention facilities, especially at the downtown jail.

In this second judicial stage, the Court will recite hereafter in this Opinion findings of fact based on evidence introduced at the September 16 hearing and then state conclusions of law as to: (a) the standards to which defendants' remedial efforts must conform; and (b) the duties and responsibilities the defendants have for proper maintenance and operation of county detention facilities.

Finally, the Court will order defendants to remedy certain problems and institute procedures to decrease the jail population while improving the quality of jail life. Thereafter, in appendices which follow the Order, the Court will point up as a consequence of the evidence forthcoming at the September 16 hearing several means of implementing these guidelines to illustrate potential alternative approaches aimed at alleviating the multiple problems at the jails.

### B. The Third Judicial Stage

The third judicial stage for bringing operation of the jails into compliance with the law will be considered at an appropriate time after six months have elapsed from the date of this Order, thereby giving this Court the benefit of the total results achieved by defendants during the second judicial stage. During this third stage, a second hearing will be conducted at which this Court will hear evidence on the following subjects:

(a) the level of performance of the Pre-Trial Release Agency in reducing the jail population;

(b) the extent to which changes in the criminal justice system have shortened the average time of disposition of cases involving incarcerated defendants, thereby decreasing population levels in the jails;

(c) whether defendants have improved living conditions in county detention facilities to an acceptable level; and

(d) changes in state and federal law, including revisions proposed by the newly-created Texas Commission on Jail Standards.

Based upon the evidence adduced at this hearing, the Court will then determine the following:

(a) whether the jail population has been reduced successfully so as to require only renovation of existing facilities and construction of additional housing capacity on the same site;

(b) whether, if the jail population has not been significantly reduced, renovation and additional construction must take place including construction or purchase of additional facilities elsewhere in the county;

(c) whether, once an appropriate renovation and construction plan for completion of such project is ascertainable from the evidence, a definitive timetable can be set up promptly for designing and constructing such installations including a consideration of all factors bearing on maximum use of public funds, such as competitive bidding, etc.;

(d) whether, regardless of population reductions achieved, jail conditions have been improved in strict compliance with the instant Order. Should the jails be found to be operated in continued violation of state and federal law and the Consent Judgment, the Court will not hesitate to give serious consideration to

adopting an entirely different course of action previously employed by other federal district courts whereby local jails have been ordered closed as of a fixed future date. *See Rhem v. Malcolm,* 377 F.Supp. 995, 999–1000 (S.D.N.Y), *aff'd,* 507 F.2d 333 (2d Cir. 1974); *Inmates of Suffolk County v. Eisenstadt,* 360 F. Supp. 676, 691 (D.Mass.1973), *aff'd,* 494 F.2d 1196 (1st Cir. 1974).

## IV. FINDINGS OF FACT

### A. Introduction: Jail Population

1. Jail conditions in Harris County, which all concerned concede have long been deplorable and inhumane, have now deteriorated to such a degree that a massive crisis exists. Presently existing facilities are designed to hold approximately 1,150 inmates; over 2,500 inmates were incarcerated as of the commencement of the September 16 hearing.

2. In September of 1974, the Harris County Jail and Rehabilitation Center, with a population of 2,039, represented some of the most dire and inhumane conditions in correction facilities across the United States.

3. With the jail population at this level, the National Clearinghouse for Criminal Justice Planning and Architecture for the Federal Law Enforcement Assistance Administration (LEAA) in late 1974 studied the corrections problem in Harris County in detail and, in early 1975, submitted a study which is entitled Harris County Corrections Plan ("Clearinghouse Study"). The Commissioners Court indicated to this Court that this study was to form the nucleus of plans to bring jail facilities into compliance with state and federal constitutional standards.

4. The Clearinghouse Study accurately analyzed the problem of corrections in Harris County as one which exists on three levels: (1) physical conditions at the jail, (2) movement of an inmate through the criminal justice system and (3) fiscal resources of the criminal justice system. The physical environment was described generally as deteriorated, over- crowded and poorly designed. The criminal justice system was criticized for incarcerating pre-trial detainees for up to six months prior to trial and for failing to utilize effectively alternatives to pretrial detention such as release on recognizance programs (ROR). Finally the Study emphasized that many of the problems associated with the shortcomings described above resulted directly from failure to finance adequately those agencies involved in criminal justice in Harris County.

5. The jail population is exploding. Four hundred more persons, or an increase of 19 percent from 2,104 to 2,506, have been incarcerated in the first eight months of 1975 as of the date of the September 16 hearing, and the population is expected to exceed 2,650 inmates by the end of the year. By 1980, the population is projected to exceed 6,400 inmates if current factors remain constant.

Of the over 2,500 inmates currently incarcerated, more than 1,700 are pre-trial detainees not yet convicted of any crime. The remaining 800 inmates are a combination of federal prisoners being held for federal trial or transfer to a federal prison, state prisoners convicted of a crime and pending appeal or awaiting transfer to the Texas Department of Corrections (TDC), and various other detainees serving county sentences or being held at the request of other authorities, such as the military or hospital authorities.

### B. Jail Conditions

6. Average living space per inmate is 20 square feet. As of September 16, more than 500 inmates had no bed on which to sleep. Other inmates slept on "beds" such as table tops and attached benches. Many inmates occupy cells in numbers that are twice the intended capacity. An intolerable stench pervades the atmosphere at the downtown detention facility. No adequate ventilation or heating exists, nor is there a sufficient number of fans to circulate air properly. As a result, the air is stagnant and geo-

metrically magnifies existing outside temperature conditions: in summer, the heat and humidity are stifling; in winter, the cold is all-pervasive, especially since many inmates must sleep on floor mattresses or on the concrete floor itself.

7. The mentally ill are incarcerated without access to any special facilities or treatment or even to dayrooms. They are never properly treated. Trained personnel are not available, nor are any trained to care for mentally ill inmates.

Inmates who are in withdrawal from narcotics or alcohol also lack proper care and treatment. According to one of the supervisors in the Sheriff's Department, incarceration of these inmates at the County Jail contributes to substantial medical and security problems within the jail and is counter-productive to their proper rehabilitation.

8. An insufficient number of guards and staff work in the jails. The present ratio is one jail guard for every thirty inmates. Violent attacks consistently occur between inmates because the lack of an adequate staff has fostered the growth of inmate "goon squads". Frequently, inmates are tortured by fellow inmates through the use of electric razors and other devices, as well as by sheer physical force. Homosexual assaults and rapes are not uncommon. Training of guards and staff is grossly inadequate to provide for the security, protection and safe treatment of the inmates.

The impact of inadequately trained, understaffed personnel is also reflected in other ways. Classification of inmates is haphazardly, and often inaccurately, accomplished. Frequently, proper classification is not possible because a lack of adequate funding precludes using more than one officer for interviewing inmates. Thus, such inmates as those with a history of criminal activity, mental illness or homosexuality are often not properly segregated from other inmates.

9. No sufficient recreation time is available either to male or female inmates at the downtown jail. Male inmates are not allowed any outdoor recreation time at all, while female inmates are permitted only one hour of outdoor activity per week. This activity takes place on the roof of the downtown facility. It is conducted at such a time of day and upon such a reflective surface that an inmate must spend most of the one hour's time adjusting to the extreme glare.

Only one hour per week recreation time is afforded to inmates housed at the Rehabilitation Center. Funding for the expansion of the outdoor recreation program there has been refused.

10. Vocational training and the availability of educational programs have been shown to be highly productive, at least as sources of daytime activity. However, funding for existing vocation and education programs has been denied. Financial assistance for teaching tools and equipment to permit volunteer teachers from local educational institutions to continue programs established by private initiative has been refused.

11. Proper housing and feeding of inmates are not possible because of overcrowded and deteriorated facilities. Proper sanitation is not observed because of the infrequency of thorough cleaning of cells and dayroom areas and the failure to provide a sufficient amount of clean clothing. Inmates are required to eat in their cells, or wherever they sleep, and the introduction of food into the living quarters enhances introduction of bacteria and other unsanitary elements such as roaches and rats into such quarters.

12. Insufficient space is available at the detention facilities for visitation of an inmate by counsel, family or friends. No weekday visitation by family and friends is permitted at the downtown facility because of space limitation.

13. There are no fire escapes at either facility.

14. Adequate medical treatment is not available at the jails, especially at the downtown facility. No screening process presently exists which promptly detects and dictates the need for isola-

tion of those inmates with communicable diseases. Insufficient facilities and personnel are available for the treatment of common ailments or relatively minor ills.

### C. Overcrowding

#### 1. Introduction

15. The above recitation of jail conditions merely highlights and does not exhaustively catalog the many and varied conditions at the detention facilities which degrade and dehumanize even those persons who voluntarily tour the facilities briefly, as did this Court. Service for almost every basic human need is at a premium, and no description of conditions by this Court can adequately describe the unavoidable combined sensations of fear, insecurity and tension that overwhelm an inmate. Attending to one's basic needs as an inmate in the County Jail is a constant struggle day and night, unabated by those infrequent periods when one is able to attempt to sleep.

The Court emphasizes the humiliating aspects of an inmate's existence to demonstrate that no one factor produces these conditions. Nevertheless, a primary source is readily recognized: overcrowding. This factor must be carefully analyzed because it too has many intertwined component parts. The Court will focus on two main components: length of time to trial; and administration in keeping track of an inmate before trial.

#### 2. The Criminal Justice System

##### a. Incarceration—Length of Stay

16. From the time of his first incarceration, an accused felon is likely to spend an average of at least four months in jail before his case comes to trial. The evidence adduced at the hearing establishes the following general timetable in the state district courts during a pretrial detainee's average 120-day stay in jail:

| Event Cycle | Length of Time | | |
|---|---|---|---|
| (a) Time from arrest to indictment | 40 days | | |
| (b) Transmission of indictment to courts for docketing | 3 days | | |
| (c) Time from receipt of indictment to docketing date for arraignment and appointment of counsel | 7 days | | |
| (d) Total time from arrest to appointment of counsel | | 50 days | |
| (e) Time from appointment of counsel to disposition of case | | | 69 days |
| TOTAL TIME FROM ARREST TO DISPOSITION | | | 119 days |

17. Defendants against whom charges are filed and whose cases are later dismissed remain in jail *longer* than those persons who are tried and convicted because of the length of time now required to process the paperwork once the case is dismissed.

18. The defendant Commissioners Court is responsible for funding the agencies which comprise the criminal justice system.

19. The daily cost to the taxpayers of Harris County of operating and maintaining county detention facilities and feeding, clothing and keeping track of inmates housed therein is $7.27 per inmate.

20. The above table shows that cases are disposed of within 69 days after counsel is appointed. This interval is very close to the 60-day minimum amount of time necessary to process a criminal case judiciously and fairly once counsel is appointed. Sixty days represents a break-even point between prompt disposition and fair disposition. The achievement of any time saving which accrues before this deadline is outweighed by the danger to the public interest which might occur if persons were convicted or acquitted for lack of adequate preparation.

■ The evidence adduced at the hearing from participants in the criminal justice system who represent differing points of view demonstrates that sound judicial economies and the interests of justice for all parties concerned therefore compel acceptance of 60 days as the absolute minimum time after arraignment before trial can be had.

21. However, no compelling reasons support the pendency of the 50-day average delay from arrest to date of arraignment. Rather, this first delay, which comprises 42 percent (50 days out of 120) of all time that a pre-trial detainee must spend in jail before coming to trial, results solely from the delays encountered by the District Attorney's Office in processing and presenting to a grand jury for indictment the enormous number of criminal cases filed in Harris County criminal courts every year. In processing these cases during the indictment stage, the District Attorney shows no preference for "jail" cases, i. e., those cases in which the accused is incarcerated until trial. As of now, counsel is not appointed until the date of arraignment.

22. All persons who testified criticized this delay in the appointment of counsel. The District Court Manager, a Justice of the Peace, a state District Judge and a professional bail bondsman all agreed that prompt appointment of counsel within 24 hours of arrest is essential to speeding the judicial process. Representation by counsel is the determining factor to a bail bondsman who analyzes the risk of forfeiture posed by a defendant. This representation is what assures a court that a defendant has proper notice of the time to appear.

23. Prompt appointment of counsel has the following salutary effects which can produce significant reductions in the rate and length of incarceration. First, counsel's critical evaluation of the charges pending against an accused can lead to a waiver of indictment, if appropriate. Second, if counsel can review and cogently represent his incarcerated client, a court might reduce or eliminate a money bond, permitting the client to be released from incarceration pending trial. Third, a realistic appraisal by counsel of charges pending against his client enhances the possibility that no trial (and no intermediate incarceration) will be necessary. That is, counsel may suggest that his client plead guilty, if appropriate; or, counsel may be able to convince the prosecution that no case should be brought. Fourth, counsel may request an examining trial before a magistrate so that a determination can be made as to whether probable cause exists to merit further prosecution of the case. A case lacking in probable cause can possibly be screened out by this process, resulting in a dismissal within a relatively short time after arrest.

Regardless of which of these variables pertains in a particular case, a basic fact acknowledged by all participants in the criminal justice system, especially the members of the judiciary in Harris County, is that the prompt entrance of counsel in a case significantly increases movement of the case forward to ultimate disposition. The accused are frequently ignorant of their legal rights and unaware of the steps which must be taken to trigger prompt processing of the case pending against them. It must also be recognized that courts are more readily able to communicate with attorneys than prisoners and are more likely to rely upon the representations of an attorney in deciding whether to release a defendant pending trial or to dismiss the charges against him.

24. The courts in Harris County presently are working at maximum capacity to try "jail" cases. Jail cases are being given preferential settings and treatment at the time of arraignment and thereafter. Additional courts can be especially effective in reducing the backlog of cases now waiting to be tried, thus diminishing the average time from arrest to trial.

25. In Harris County, this maxim has proved true through prior experience with so-called "annex courts". These courts are special temporary creatures of the Texas Criminal Justice Council, a

state agency to which first resort is had for their creation and funding. Annex courts may be utilized with two different kinds of dockets—a "trial docket" consisting of cases which cannot be tried in the originating court and a "jail docket" consisting only of cases involving those incarcerated persons awaiting trial.

26. Of the two docket formats, use of annex courts as "jail docket" courts works more effectively to reduce the average length of time from arrest to disposition. Annex courts are currently needed in Harris County to alleviate the backlog under which regular district courts must now function. Such courts must carry "jail dockets" to have immediate effect on the level of the inmate population.

27. Even with the creation of these annex courts, their potential for reducing the average length of time to disposition will not be translated into an actual reduction unless cases are ready for disposition in a shorter period of time. That is, unless counsel is appointed immediately and the case is placed on a docket, all expected gains from an increase in the number of courts will not be forthcoming.

### b. Keeping Track of an Inmate

28. Eighty percent of all persons who become inmates at the Harris County Jail are arrested by a City of Houston police officer for a crime allegedly committed within the Houston city limits. Such persons are first taken to the City Jail at 61 Riesner Street for booking. The remaining inmates housed in Harris County are either county prisoners, county detainees, or prisoners being held over at the request of other jurisdictions. There are five different municipal police jurisdictions within the City of Houston.

A recitation of the many administrative tasks which are now being performed to keep track of an inmate while he or she is incarcerated illustrates several of the factors which affect the length of a pre-trial detainee's stay in jail.

### (1) Booking and Processing at the City Jail

29. Upon arrival at the City Jail, an arrested person is taken to the booking area. Charges are filed by the arresting officer, the person is placed in custody, and a cursory check is made to ascertain whether the person needs emergency medical treatment. While the arrestee is at the booking area, various information about him is recorded in the police "blotter".

The person is then photographed, searched, and his property is checked and placed in a safe.

30. The person, now an inmate, is then taken to the fourth floor for further processing unless an investigation is to be conducted. At the fourth floor, the inmate is officially booked, i. e., his photograph is taken for a "mug shot", and he is fingerprinted. Much of the same information previously recorded at the booking area is transcribed again on various forms used by city police officials. A check is made with the Federal Bureau of Investigation (FBI) to determine whether the inmate has a prior criminal record or whether any charges or detainers are presently outstanding against him. The inmate is then taken to a cell to await further processing. He has free access to a telephone to make telephone calls while he is in "hold". Posted prominently next to each telephone unit is a listing of telephone numbers of numerous commercial bail bondsmen but no such listing for the Pre-Trial Release Agency. If the inmate is not needed for interrogation as part of an investigation, he will complete processing within forty-five minutes to one hour after first arriving at the City Jail.

### (2) Processing at the District Attorney's Intake Office

31. Simultaneously with the booking procedure, processing is taking place in another building. The arresting officer goes to the Intake Office at the City Jail established for the District Attorney. At that office, which is now located in a

warehouse a few yards from the City Jail and which is scheduled to move into the new Municipal Courts Building soon to open, a decision is made whether the case should be prosecuted. The arresting officer fills out forms describing the nature of the offense and the subject's participation in committing that offense. The officer then discusses the case with an Assistant District Attorney who decides whether to file charges. The Intake Office is open 24 hours a day. At times interns from area law schools are employed by the prosecutor to assist in the administration of the office.

32. If the decision is made not to prosecute, the charges are dropped, the case is dismissed, and the inmate is released shortly thereafter.

33. If the decision is made to prosecute, the charge will be prepared on a multi-part form from the offense report and from other information which is similar in many respects to what has already been gathered by the city at the booking area. A court docket number, a justice-of-the-peace number and a criminal case number are all assigned so that the inmate is immediately categorized on a judicial docket. The prosecutor will also include a recommendation as to money bond for the benefit of the magistrate, typically a Justice of the Peace, based on a printed form bail schedule utilized in criminal cases.

34. Recent technological innovations are used to keep track of a prisoner arrested in an outlying area of the county such as Tomball, Baytown, or Clear Lake. That prisoner will have been brought to an area sub-station, booked and presented to a Justice of the Peace. The information gathered about that prisoner and a report of the circumstances of his arrest are transmitted via teletype machine to the District Attorney's Intake Office. A decision is made upon a review of these data in a fashion similar to that which is made by the prosecutor after a live interview with an arresting officer of the Houston Police Department.

If the prosecutor decides that the case should be tried, the multi-part form is prepared with the same assignment of the inmate within the judiciary. The form is then sent by telecopier to the field sub-station from which the case originated.

### (3) Entry Into the County Jail

35. Once the decision is made to prosecute and an amount has been set as the amount of bail in the case, an inmate who is unable to make bond is scheduled for transfer from the City Jail to the downtown County Jail.

36. Harris County sheriffs transfer prisoners from the City Jail to the County Jail three times each day via police van. Upon his arrival at the County Jail, a prisoner is brought to the booking area for the downtown detention facility. This booking area is identical in design and purpose to the one at the City Jail. The information taken about the prisoner here requires five hours of "booking" time and is practically identical to the information previously transcribed at the City Jail. A central record is maintained for each prisoner and the prisoner's location is also logged on the "IN–OUT" book, a manually prepared record of the inventory of all inmates at the downtown facility.

37. Once an inmate has been booked, he is taken to the "ID" room where he receives jail clothing and checks his personal property. He is then taken to a cell. Assuming an interview takes place, the inmate is interviewed by the Classification Officer within a few days to determine whether he requires special classification and placement.

A different procedure is utilized for "weekenders," i. e., those persons who are required to serve sentences only on weekends. A different inventory is maintained for them because of their status and the brief duration of their stay, but formal recordation is required nevertheless. Every time a weekender arrives, the entire intake procedure must be repeated.

38. An inmate is allowed one telephone call per week. Posted prominent-

ly next to each telephone unit is a listing of the telephone numbers of numerous commercial bail bondsmen but no such listing for the Pre-Trial Release Agency.

39. The duplicative recordation of prisoner data recurs at almost every stop an inmate makes while he or she is incarcerated. According to a systems analyst employed by the Harris County Sheriff's Department, the same data may be collected up to 43 times as each governmental entity—for example, the District Clerk, the Sheriff, the City Jail and the District Attorney—strives to satisfy its need for information. There currently exists a computer system— SIPS (subject-in-process)—recently designed to assist the state judiciary in keeping track of all prisoners who are awaiting trial. But this system is not designed to assist other county agencies involved in the criminal justice system such as the District Clerk's office, the Sheriff's Department, or the District Attorney's office and is therefore of no aid in reducing duplicative record keeping.

### (4) Appearances in Court; Attorney-Client Consultation

40. Attorneys have access to their clients at two different locations within the county downtown facility depending on whether the client is set for a court hearing. During the period before the case is set, two rooms are available for attorney-client consultation.

On the morning of an inmate's trial setting, he is transferred at 4 a. m. to a holding cell located adjacent to an enclosed walkway which connects the jail with the criminal courts. This holding cell has bench capacity for 30 persons, but frequently more than 80 persons are placed there. The inmates then wait in their cell from 4 a. m. until the time their cases are called. Court sessions do not begin until 9 a. m.

While an inmate is in a holding cell awaiting the call of his case, the attorney is permitted to see him to consult and advise him.

41. Those county inmates who are transferred to the Rehabilitation Center are booked via computer hookup with the downtown facility. Consultation with counsel is as difficult to accomplish at the Rehabilitation Center as at the downtown facility. Only two booths exist for attorney-client interviews. Frequently, consultation takes place in the total absence of privacy at any available open space such as a bench in the central lobby of a floor adjacent to a cell wing.

### 3. Pre-Trial Release Agency

#### a. Origins

42. In 1972, a committee of the Houston Junior Bar Association chaired by James Greenwood, a local attorney, established the Pre-Trial Release Agency ("Agency"). The agency, which received wide support from county officials at its inception, was originally designed to maintain contact with persons who had been released pending trial. The person selected to head the agency was Walter Williford, a man who had many years of experience dealing with prisoners while working for the Texas Board of Pardons and Paroles.

43. Though conceived with a strong fundamental premise and great expectations, the agency has never lived up to these expectations.

44. The agency has never been able to operate at the City Jail. Since 80 percent of all arrested persons at the County Jail enter the system through the City Jail, the agency has had no opportunity to interview most of these persons, many of whom were otherwise eligible for release on recognizance.

45. The initial refusal of city officials[1] to permit the agency to have

---

1. Credible evidence adduced at the September 16 hearing demonstrated that the attitude of non-cooperation was exhibited solely by persons who served in the municipal administra-

tion until 1974. The evidence indicates that the current city administration has altered this attitude and has expressed a desire to cooperate fully to permit the agency to have space

access to the City Jail resulted in part from their lack of understanding of the proper functioning of the agency and in part from the failure, or inability, of county officials to negotiate adequately with city officials to gain such access. It must also be recognized that the presence of multiple, overlapping government jurisdictions, each endowed with co-extensive, mutually exclusive political authority within the same geographical area, contributed to lack of communication and lack of motivation on the part of each jurisdictional entity to resolve joint problems through joint efforts.

### b. Impact of Bail Bondsmen

46. By far the most significant single factor influencing the agency's lack of success was the organized effort of commercial bail bondsmen to sabotage the agency. The bondsmen see the agency as a potential economic threat to their "market"—those arrested persons who can afford money bonds but who at the same time are eligible for release on recognizance without having to compensate commercial bondsmen. Thus threatened, the bondsmen have admittedly brought considerable political pressure to bear on both city and county officials to hamper efficacious operation of the agency.

Credible evidence demonstrates that the decision of City of Houston police officials in 1972 to deny access to the

agency resulted, at least in part, from this political pressure. At the same time, the bondsmen pressed their attack on county officials to take steps to weaken the agency. For the most part, their efforts have been successful.

### c. Pre-Trial Release Today

47. Today, the agency is foundering. The Commissioners Court has established the agency, has designated certain office space for its operation and has allocated certain budget for its use.[2] But the Commissioners Court has done little more than provide a brittle skeletal framework for the one agency which was intended to possess sufficient strength to blunt the force of a rapidly expanding jail population.

No real support is offered to the agency to enhance its success because the agency is politically unattractive to the Commissioners Court. The result is an agency which has almost ceased to function as a viable component of the Harris County criminal justice system.

48. The agency's decision to release a defendant on his recognizance lacks credibility with the judiciary, the final arbiters of its success or failure. To any Harris County District Judge, the ability of the agency to retrieve and return to the system any defendant who fails to appear is a significant factor in deciding whether to issue a personal bond.

made available at city facilities. As of the time of the hearing, however, the agency was not operating at the City Jail despite this cooperative attitude. The reasons for its absence from the City Jail are set out in more detail in the text which follows. *See* Finding of Fact 46, *infra.*

2. The scant support offered to the agency by the Commissioners Court is demonstrated by the budget allocation for the agency. The current budget for the agency totals $132,225 per year, with approval on a month-by-month basis. Of this total, $27,225 was actually allocated by the Commissioners Court from the general funds; $105,000 was allocated from "FUND 9", a fund comprised solely of fees representing three percent of the dollar amount of all commercial bonds written. *See* Tex.Rev.Civ.Stat.Ann. art. 2372p–2, § 4. Because the vast majority of the agency's budget

is directly dependent upon the number of bonds written by professional "money" bondsmen, the agency's survival is dependent upon sustaining the operation of an entity antithetical to the proper operation of release on recognizance.

The detracting influence of the professional bondsmen on the agency extends beyond the agency's financial dependence upon the bondsmen. The Commissioners Court recently created a committee of nine persons to supervise and set standards for the agency while rejecting a resolution of the District Judges to transfer control of the agency to them. Along with members of the criminal justice system, a professional bondsman serves on the committee for no productive reason that could be credibly demonstrated by the evidence. In the months since the committee was created, the performance of the agency in terms of the number of personal bonds written has deteriorated.

The agency's current lack of credibility with the judiciary derives from the following deficiencies in agency resource allocation, policy and procedure:

(a) the agency fails to notify a defendant released on recognizance of the time to appear in court;

(b) the agency utilizes no system to check for an absentee before his scheduled court setting is called, such as requiring the defendant to appear in the agency office one hour before the scheduled appearance;

(c) the agency makes no effort to locate an absentee prior to forfeiture of the bond;

(d) after forfeiture, the agency does not authorize a priority effort to retrieve a defendant and bring him to custody; and

(e) the agency does not maintain accurate records of the number or identity of all defendants released on personal bonds.

49. The Criminal Warrants Division of the Sheriff's Department is responsible for serving bond forfeitures. Certain of these warrants, such as bench warrants and warrants for mental patients, are given priority under state law. Because of this priority arrangement and because the division does not have sufficient staff to serve even these priority warrants, the division has no available manpower or time allotted to serve personal bond forfeitures. Indeed, over 10,000 arrest warrants five years old or older are currently outstanding because of lack of resources and manpower. These warrants are for the arrest of persons who are charged with having committed criminal offenses but who have never been brought to justice.

Additional personnel on the division staff will be needed to serve personal bond warrants to provide proper support for pre-trial release efforts.

50. The failure of the agency to reach many of the detainees and not adequately process those whom it does reach is reflected in many ways:

(a) the recorded number of defendants on personal bonds decreased by 466 in the first eight months of 1975 from a total of 1,580 to 1,114. This represents a decrease of 30 percent in those eight months, at a time when the jail population was increasing by more than 15 percent from a total of 2,104 inmates to 2,506;

(b) an average of 241 persons per month were released on personal bond in each of the last three months of 1974. An average of 172 persons per month were released on personal recognizance during each of the summer months of 1975;

(c) according to the testimony of Sam Alfano, a professional bondsman, a person who cannot afford to pay cash bondsmen or an attorney is a person who is married, has a child and earns $150 per week; and

(d) a substantial number of those persons released on personal bond are indigents who would otherwise remain in jail if bail were not granted.

51. Coupled with the agency's lack of credibility is its inability to interview and record promptly and accurately all of the incoming inmates. The current interview process is very time-consuming and cannot now be conducted in a suitable environment. The interview staff does not understand the data recorded by Sheriff's Department officials when inmates are booked and does not know where to find many of the inmates.

52. The agency determines eligibility for release on recognizance, as it must, on a case-by-case basis. The largest impediment to prompt, efficacious operation of pre-trial release is the agency's use of, and total reliance upon, a subjective standard of evaluation of each interviewee. That is, the "gut" reaction of the interviewer is used to determine whether a defendant is a good risk for release on recognizance.

The Court recognizes that the interview process cannot be totally objective and must tolerate some flexibility in approach to account for individual differ-

ences of defendants. However, the "subjective" approach has two fundamental weaknesses: (1) it cannot be communicated adequately to agency interviewer-trainees, each of whom must therefore be trained extensively before adapting properly to the system; and (2) it injects an interviewer's own personality and values into an interview to such a degree as to override meaningful consideration of more pertinent criteria. For example, under the present system, a defendant who would otherwise be eligible for release because of strong family ties to the community, a reliable employer, or other such favorable criteria, may receive an unfavorable recommendation from the interviewer because of the presence of a personality conflict or other negative intangible between the interviewer and interviewee.

53. Below are listed a few of the many reasons for the agency's ineffectiveness:

(a) the agency is harassed by the professional bondsmen;

(b) the agency has inadequate numbers of personnel, inadequate supervision, inadequate training for new personnel and inadequate internal procedures;

(c) the agency has been inadequately supervised and managed;

(d) the agency has inadequate and insufficient office space;

(e) the agency's budget is inadequate which results in high turnover of personnel because of inability to pay competitive salaries;

(f) the agency has failed to maintain credibility with the judiciary because of its lack of success in ensuring timely appearance or securing prompt retrieval of a defendant who forfeits his PTR bond;

(g) the agency cannot even begin to interview all persons incarcerated at the County Jail who could otherwise be eligible for release on recognizance; and

(h) the agency fails to screen and interview properly all incoming inmates because the agency uses a time-consuming interview process premised upon the need to make a subjective evaluation of an interviewee to determine his eligibility for release on recognizance.

### d. Cost of Inadequate Pre-Trial Release

54. The combination of bondsman harassment, a lack of credibility and utilization of a time-consuming technique have taken their toll on the agency and on the taxpayers of Harris County as well.

55. As of the starting date of the September 16 hearing, there were more than 1,700 pre-trial detainees among the inmate population at the Harris County Jail. Thirty percent of these pre-trial detainees, or about 510 persons, were characterized by the Sheriff as inmates immediately eligible for release on recognizance under even the most stringent standards of review.

56. However, because of the inability of the agency to reach these persons, they remain incarcerated until the time of their trials, a period of time currently averaging 120 days.

The cost to the taxpayer from this over-incarceration is obvious. Caring for each incarcerated person costs the county $7.27 a day, or $3,707.70 per day for the above 510 inmates. Since these inmates are incarcerated for about 120 days before trial, the cost to taxpayers of this incarceration is $444,924.00 over a 120-day period, or $1,334,772.00 per year.[3]

57. There are other costs to be borne as well. According to the Project Director of the Sheriff's Department, a reduction in time to trial of 25 percent, i. e., from 119 days to 90 days, would result in an annual saving to the county of $795,865.00.

58. Between 40 percent and 50 percent of all of those defendants who are released on personal bond are so released

---

3. The entire annual budget for the Pre-Trial Release Agency is $132,225. *See* Finding of Fact 47 and n. 2, *supra.*

only after their first court appearance before a judge or only after an attorney has entered the case. As previously indicated, *see* Finding of Fact 16, *supra,* the average delay from time of arrest to time of first court appearance and appointment of counsel is 50 days. At the current release level on personal bond of 172 persons per month, roughly half of these persons, or 86 per month, are detained an average of 50 days at the county's expense before being released on their own recognizance.

59. In any one month, therefore, 86 persons are being kept by the county for no reason, at a cost to the taxpayers of $625.22 per day, based on the daily cost figure of $7.27 per inmate. Ignoring any overlap in the length of detention of one set of detainees from one month to the next (to account for the total 50 days), and therefore presuming that only 86 persons per month are detained as described above, the cost to the taxpayers of detaining persons who are eventually recognized to have merited release on recognizance from the time of their arrest is $18,756.60 for 30 days, or $225,079.20 per year.

### e. An Objective Approach to Pre-Trial Release: The Manhattan Bail Bond Project

60. At the behest of a philanthropist who established a charitable foundation—the Vera Institute of Justice—to fund its operation, the Manhattan Bail Bond Project ("Manhattan Project") was created in New York City in 1961 to institute pre-trial release procedures there. Six or seven full-time staff members worked in the office, along with five or six law students who were employees of the Project paid to assist with the interviewing and perform other tasks in the office, such as verification.

The creation and technical operation of the Project have been described elsewhere. *See* Botein, *The Manhattan Bail Project: Its Impact on Criminology and the Criminal Law Processes,* 43 Texas L.Rev. 319 (1965); Paulsen, *Pre-Trial Release in the United States,* 66 Colum.L. Rev. 109, 116–18 (1966). For purposes of this case, the Court focuses only on those principles of operation which are pertinent to an inquiry to determine an efficacious method of operation for a pre-trial release agency. An alumnus of the Manhattan Project, David Hittner, testified at the hearing and described some of the underlying principles that guided the project's operation.

61. *Retrieval.* The project focused heavily on retrieval. A concerted effort was made on the part of the staff to ensure prompt and reliable appearances by defendants at the appointed times. Notice of the hearing was sent by the staff; appearance in the Project office for check-off one hour before the time of the scheduled court setting was required; and concerted efforts were made by the staff to locate and notify those not present, even to the extent of a physical search.[4]

62. *Objective Evaluation of Defendants.* The Project used objective criteria to evaluate a defendant's eligibility for release on recognizance. To qualify for such release, the defendant had to be an area resident, had to have an address where he could be reached and had to amass at least five points on the objective point system checklist. Defendants who had committed certain categories of offenses were automatically excluded. No distinction was made on the basis of a defendant's wealth. No defendant was excluded because he could afford a cash bond, and the Project did not interview only indigents.

---

**4.** A typical failing of the present Harris County pre-trial release system occurs when a defendant released on personal bond fails to appear in court at the appropriate time. When this happens, the court typically will revoke the bond and issue a warrant for the defendant's arrest. Often, upon serving the warrant, the Sheriff will discover that the defendant is easily located at the address he has provided to the court, usually his or his parents' home address. He has failed to appear solely for lack of proper notice or lack of an adequate reminder, not from an attempt to evade the law.

A form was devised onto which to transcribe information about the defendant's background and his current residential and employment situation. The information was taken down during an interview with the subject by a staff member or volunteer interviewer (such as a night school law student) who merely recorded the information in the appropriate location on the form, assigned corresponding pre-established "point" values to the various criteria and tallied the total number of points. The interviewer would then verify the information and finalize the interview sheet for presentation to the judge.

63. *Conclusion.* The combination of an objective point system and reliable retrieval produced remarkable results for the Manhattan Project. The program was very successful: only 2.6 percent of all defendants released on recognizance failed to appear in court, a rate lower than that experienced with defendants who had been bonded out by professional bondsmen; of those who were initially released on recognizance, 48 percent were eventually found not guilty;[5] 70 percent of the Project's recommendations were accepted by the courts.

## V. CONCLUSIONS OF LAW

### A. Introduction

1. Jurisdiction is proper in this Court.

2. A Consent Judgment signed by all parties and approved by this Court on February 4, 1975, is currently in effect in this case. Under the Consent Judgment, the defendants have agreed to take steps to improve conditions in Harris County detention facilities so that operation and maintenance of the facilities is brought into full compliance with federal and state law.

3. "Massive precedent in the matter of state prison operation reflects the long maintained attitude of this Court to avoid unnecessary intervention in and interference with the internal administration of state penal institutions, subject to one paramount principle, the Court never hesitates to vindicate the federally guaranteed constitutional rights of those imprisoned therein". *Taylor v. Sterrett,* 499 F.2d 367, 369 (5th Cir. 1974), *cert. denied,* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975).

4. This Court, in the exercise of its pendent jurisdiction, also has the constitutional power to order defendants to comply with the laws of Texas. *Taylor v. Sterrett, supra.*

5. When a Court of the United States finds numerous constitutional violations in the operation of a detention facility which have been conceded by defendants, the Court has the duty and obligation to fashion effective relief and is allowed wide discretion. *Gates v. Collier,* 501 F.2d 1291, 1320 (5th Cir. 1974). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies". *Swann v. Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

6. There are two primary factors which determine the size of the jail population: number of persons arrested who are not released on bond; and average length of time from arrest to disposition in a "jail" case. A broad-based, integrated approach to combat the problem of overcrowding must be adopted. Such

---

**5.** Credible evidence suggests that a person who is released in the pre-trial phase of his case stands a much greater chance of succeeding at trial than a person with a similar case who is incarcerated. One obvious explanation is the greater accessibility of the released defendant to his attorney, with the corresponding increase in time to investigate and prepare a defense.

It must also be recognized that for many years continuing until recently, a pre-trial detainee came to trial in Harris County dressed in jail clothes, an element which inherently prejudiced his opportunity to convince a jury of his innocence. *See, e. g., Williams v. Beto,* 364 F.Supp. 335 (S.D.Tex.1973), *rev'd, Williams v. Estelle,* 500 F.2d 206 (5th Cir. 1974), *cert. granted,* 420 U.S. 907, 95 S.Ct. 823, 42 L.Ed.2d 836 (January 27, 1975).

an approach necessarily incorporates requirements to be met which will affect the entire criminal justice system.

### B. Jail Conditions

7. Defendant Commissioners Court has a duty to maintain a safe and suitable jail. Tex.Rev.Civ.Stat.Ann. art. 5115. The Commissioners Court is required to keep the jails in repair. Tex. Rev.Civ.Stat.Ann. art. 2351.

■ The defendants have breached their duty in violation of the above laws and the detailed mandate of the Consent Judgment. Despite the entry of the Consent Judgment, the jails, particularly the downtown facility, continue to be unsafe, unsanitary, understaffed, underfinanced and poorly supervised.

■ 8. Defendants have a duty to comply fully with the principles of "safe and healthful provisions" established by the Texas State Department of Health for the proper maintenance of the County Jail. Tex.Rev.Civ.Stat.Ann. art. 5115. Agents or Inspectors of the Texas State Department of Health are charged with the responsibility of making periodic inspections of the jails. *Id.*

■ 9. A person during his incarceration has the right to be secure in his person. U.S.Const. Amends. VIII, XIV; *Finney v. Arkansas Bd. of Corrections,* 505 F.2d 194 (8th Cir. 1974); *Holt v. Sarver,* 442 F.2d 304 (8th Cir. 1971).

■ 10. The state lacks the authority to subject pre-trial detainees to the same punishing circumstances as convicted persons, since the imposition of punishment without conviction deprives the accused of due process. *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951); *Anderson v. Nosser,* 438 F.2d 183 (5th Cir. 1971), *aff'd and modified en banc,* 456 F.2d 835 (5th Cir. 1972) (en banc), *cert. denied,* 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1973), *aff'd after remand,* 507 F.2d 929 (5th Cir. 1975); *Rhem v. Malcolm,* 507 F.2d 333, 336–38 (2d Cir. 1974); *Taylor v. Sterrett,* 344 F.Supp. 411, 413 (N.D.Tex.1972), *aff'd and re-manded for re-consideration of remedy,*

499 F.2d 367 (5th Cir. 1974). *See generally* Note, *Constitutional Limitations on the Conditions of Pretrial Detention,* 79 Yale L.J. 941 (1970); Note, *Preventive Detention Before Trial,* 79 Harv.L.Rev. 1489 (1966).

■ 11. The defendants must segregate inmates suitably by classification. As the relevant state statute provides:

"The term 'safe and suitable jails,' as used in this Act, shall be construed to mean jails which provide adequate segregation facilities by having separate enclosures, formed by solid masonry or solid metal walls, or solid walls of other comparable material, separating witnesses from all classifications of prisoners; and males from females; and juveniles from adults; and first offenders, awaiting trial, from all classifications of convicted prisoners; and prisoners with communicable or contagious diseases from all other classifications of prisoners."

*See* Tex.Rev.Civ.Stat.Ann. art. 5115 (1975).

■ 12. Lack of adequate economic resources does not excuse, nor does it lessen, the obligation of states and local governments to provide jail facilities which are constitutionally adequate. *Finney v. Arkansas Bd. of Corrections, supra; Wyatt v. Aderholt,* 503 F.2d 1305, 1315 (5th Cir. 1974); *Gates v. Collier,* 501 F.2d 1291, 1319–20 (5th Cir. 1974).

■ 13. The Sheriff owes a duty to prisoners to keep safely a person committed to his custody. Tex.Code Crim. Proc.Ann. art. 16.21. The Commissioners Court must approve the number of jail guards when they become necessary for the safekeeping of prisoners and the security of jails. Tex.Rev.Civ.Stat.Ann. art. 6871.

■ 14. Inmates may not act in a supervisory or administrative capacity nor administer disciplinary action over other inmates. Tex.Rev.Civ.Stat.Ann. art. 6184k–1.

### C. Criminal Justice System

15. The Commissioners Court has the duty to pay attorneys' fees out of the general fund of the County to counsel appointed to defend a person accused of committing a felony or a misdemeanor punishable by imprisonment. Tex.Code Crim.Proc.Ann. art. 26.05.

The Commissioners Court is authorized to provide legal services in addition to such services required by Article 26.05. *See* Tex.Rev.Civ.Stat.Ann. art. 2372p–1. Under Article 2372p–1, the Commissioners Court may contract with a local entity, whether established by the bar association or otherwise, to assist the courts in providing timely and effective assistance of counsel. Tex.Rev.Civ.Stat.Ann. art. 2372p–1, § 1.

16. Other efforts are required to be made by the Commissioners Court under subsequent sections of Article 2372p–1 to ensure proper coordination of appointment of counsel with court appearances and·release on personal bond. *See* §§ 2–5, Tex.Rev.Civ.Stat.Ann. art. 2372p–1.

17. Whenever a district or county court determines that a person is too poor to employ counsel, the Court shall appoint counsel. Tex.Code Crim.Proc. Ann. art. 26.04. Magistrates may appoint counsel at examining trials, Tex. Code Crim.Proc.Ann. art. 16.01, and may release a defendant on his personal bond, in which case the bond may be transferred to any court wherein the case may be heard. Tex.Code Crim.Proc.Ann. art. 17.031.

18. As the term is defined in Article 2.09 of the Texas Code of Criminal Procedure, "magistrate" includes District Judges, County Judges, Judges of the County Courts-at-Law and County Criminal Courts, Justices of the Peace and Judges of the Municipal Courts of incorporated cities.

█ 19. A judge of a Municipal Court sitting as a magistrate has jurisdiction to accept complaints on cases which he cannot try on the merits, issue warrants of arrest, hold examining trials and transfer cases to other magistrates in the county for purposes of holding examining trials, in all cases which have occurred within the county. Atty. Gen.Op. C–718 (1966).

20. At the present time, counsel is not usually appointed for an indigent defendant until he has been in jail for an average of 50 days. Courts are usually reluctant to appoint counsel quickly because they do not wish to interfere with the defendant's attempts to procure counsel. They therefore wait until the date of the first court appearance before appointing an attorney for an indigent defendant. Usually, however, the indigent defendant is ignorant of his right to appointed counsel and, failing to request one quickly, he remains in jail and his case remains at a standstill until the date of his first court appearance.

█ The magistrates also have authority, now rarely invoked, to afford legal representation to indigent defendants. A magistrate may, as an adjunct of the state District Judges, appoint counsel to represent indigent defendants and may also appoint counsel for a defendant who requests an examining trial. Tex.Code Crim.Proc.Ann. art. 16.01.[6]

---

6. The second sentence of Article 16.01 is worded in a restrictive manner regarding a magistrate's authority to appoint counsel: "(T)he magistrate may appoint counsel to represent an accused in such examining trial only." Judge Rodney Parrett of the City of Houston Municipal Courts indicated at the September 16 hearing that he understood Article 16.01 to restrict his power to appoint counsel for an indigent defendant charged with committing a felony so that he could not appoint counsel other than for an examining trial.

Statutory language does not compel this conclusion. The pivotal statute, Article 26.04, Tex.Code Crim.Proc.Ann. art. 26.04, provides that a court shall appoint counsel in a case involving a felony or a misdemeanor punishable by imprisonment "[w]henever the court determines at an arraignment *or at any time prior to arraignment* that an accused . . . is too poor to employ counsel . . . ." (Emphasis added) Tex.Code Crim.Proc.Ann. art. 26.04(a). The statute does not define "court" and there is no definition of "court" within the

Article 16.01 also provides that a magistrate shall allow the accused sufficient time to procure counsel.

Few indigent defendants know of their right to request an examining trial. Further, their indigent status and immediate need for counsel are, as a practical matter, apparent from the outset. Nevertheless, a magistrate will automatically delay setting any examining trial for seven to ten days to permit the defendant to exercise his right to procure counsel.

21. The multiple, overlapping jurisdictions which operate within the geographical boundaries of Harris County and the several law enforcement, judicial and administrative agencies which operate within the county governmental structure produce schismatic effects on the administration of criminal justice in Harris County. For example, the City of Houston and other municipalities within the city limits (such as West University Place, Bellaire and Hunter's Creek Village) are the primary sources of inmates incarcerated in the County Jail. Yet, each entity maintains its own recordation of prisoner inventory and movement and does not share such data with the County, the ultimate custodian of county prisoners. The same data must therefore be collected repeatedly, as many as 43 times.

The County District Attorney's Office has acknowledged the impact of City of Houston law enforcement efforts on the functioning of the county criminal justice system and the size of the County Jail population by establishing an Intake Office in close proximity to the core of the prisoner input. However, no such corresponding acknowledgment has been rendered by the Commissioners Court for the Pre-Trial Release Agency.

### D. Pre-Trial Release Agency

22. The Commissioners Court has the power to establish a pre-trial release agency and employ a director and staff. Tex.Rev.Civ.Stat.Ann. art. 2372p–2.

23. Having established a Pre-Trial Release Agency pursuant to statutory direction which is empowered to determine the eligibility of accused persons for release on recognizance, the Commissioners Court may not restrict the operation of the agency to assist only indigent persons. Preventing access to release on recognizance for all persons denies them

---

Code of Criminal Procedure that suggests excluding Municipal Courts from the definition. Similarly, the definition and description of "arraignment", see Tex.Code Crim.Proc.Ann. arts. 26.01–26.03, states no limitation as to which judicial body must conduct such a proceeding.

However, it must be recognized that no court can accept a plea in a case involving the trial of a defendant on criminal charges over which it has no jurisdiction. Since municipal courts may not try any case in which imprisonment may be imposed, Tex.Rev.Civ.Stat.Ann. art. 1195, the Texas Legislature did not intend to permit municipal courts to arraign such accused persons.

Nevertheless, while municipal courts and other magistrates with similarly limited jurisdiction may not arraign, it is not clear that they are therefore precluded from appointing counsel in imprisonment cases. As noted above, the magistrate's statutory power to appoint counsel for an examining trial may be illusory because of a typical defendant's ignorance of his right to request such a trial. Additionally, the statute does not indicate whether counsel appointed for an examining trial may continue his representation after the examining trial, may inquire of his client whether he wishes to waive indictment or plead guilty, whether he may plea bargain on behalf of his client or whether he may otherwise take action which would save the State the expense of a full trial following indictment.

More importantly, Article 26.04 does contemplate the appointment of counsel for an indigent defendant before the time of arraignment. Many participants in the criminal justice system who testified at the September 16 hearing, including members of the state judiciary, emphasized the need to appoint counsel as soon after arrest as possible, expressing their view both as to the importance of the presence of counsel in speeding the criminal process and as to the absence of any limitation on the power of the judiciary to appoint counsel quickly.

Upon a review of the testimony and the applicable law, the Court therefore concludes that no state statutory provision exists which prevents prompt appointment of counsel by an approved adjunct of the state judiciary.

due process and equal protection of the laws.[7]

24. The failure of the Commissioners Court to attempt to locate the Pre-Trial Release Agency at the City Jail has contributed to a denial of equal access to release on recognizance. Defendants otherwise able to afford bond have been precluded as a practical matter from attempting to exercise their option to be considered for release on recognizance.

As of this time, the exercise of such option requires a person to remain incarcerated at the City Jail until such time as he or she is transferred to the downtown County Jail and to continue to remain incarcerated at the County Jail until a representative of the Pre-Trial Release Agency can interview him. There is a 75 percent chance that he will not be interviewed. More chilling to the exercise of his option than this probability of being missed by agency personnel is the harsh reality of having to endure the physical and psychological impact of the jail environment during this interim. If the agency is not able to evaluate him, he faces 50 days in jail before his first court appearance.

The tardy introduction of pre-trial release into the jail population therefore forces most citizens of modest income to seek immediate release by the only other means available: a cash bond.

### E. Federal Court Efforts to Remedy Illegal Jail Operation

25. A survey of the most relevant case authorities points out the divergent means of implementing needed changes and the uniform philosophy underpinning those changes. The Court has placed special emphasis on the changes ordered by other federal district courts located within the boundaries of the Fifth Circuit. *See Taylor v. Sterrett,* 344 F.Supp. 411 (N.D.Tex.1972), *aff'd and remanded for reconsideration of remedy,* 499 F.2d 367 (5th Cir. 1974) *cert. denied,* 420 U.S. 983, 95 S.Ct. 1414, 43 S.Ct. 665 (1975) ("The Dallas Case"); *Miller v. Carson,* Civil Action No. 74–382–Civ–J–S (Order and Opinion and Permanent Injunction) (M.D.Fla. July 17, 1975) ("The Jacksonville Case"); *Hamilton v. Landrieu,* 351 F.Supp. 549, (E.D.La.1972) ("The New Orleans Case"). The Court has also selected *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio 1971), *aff'd,* 456 F.2d 854 (6th Cir. 1972) ("The Toledo Case"), which is representative of judicial action in this area taken by federal district courts in other circuits.

26. An outline cataloguing and describing briefly the changes that have been ordered by these four district courts is hereafter set out by subject matter heading:

(a) CRIMINAL JUSTICE ALTERATIONS (INCLUDING PRE–TRIAL RELEASE)

(1) *Jacksonville*

Numerous changes suggested in legal procedures available to inmates and in Pre-Trial Release Program (pp. 71–73).

(2) *Toledo*

Defendants ordered to improve Pre-Trial Release Program and to expand number of prosecutions by information instead of indictment (pp. 714–15).

(b) HIRING ADDITIONAL PERSONNEL

(1) *Dallas*

Local officials must provide jail guards sufficient for security; no further use of inmates to enforce jail regulations (pp. 422–23).

---

7. Persons otherwise able to afford "money" bonds would likewise usually qualify for release on recognizance regardless of whether a subjective or objective standard were used. For example, an accused person with a family, no serious criminal record and employment which provides more than $150 weekly income generally will compile sufficient "points" to qualify under the Vera approach for release on recognizance.

He should be given the opportunity to so qualify and should not be forced to rely solely on the payment of money for his release.

(2) *Jacksonville*

Defendants must obtain full-time physician (p. 75), additional nurses (p. 76), trained sanitarian (p. 70), medical secretary (p. 77), psychiatric consultant (p. 77), full-time trained nutritionist (p. 78) and adequate number of correctional officers (p. 82).

(3) *New Orleans*

Defendants must hire additional kitchen staff (p. 7), additional security guards (pp. 2–3), a professional full-time penologist (p. 2), six additional administrative staff members (p. 5) and an additional maintenance staff (p. 9); cannot use inmates to perform any employee task involving security risk (p. 3).

(4) *Toledo*

Operators of jail must provide additional security guards and supervisory personnel (p. 715).

(c) TRAINING JAIL PERSONNEL

(1) *Jacksonville*

Defendants must devise psychological tests to determine whether employee is suitable for employment in detention facilities; must devise complete training program (p. 83).

(2) *New Orleans*

All employees must be civil service qualified (p. 3), and all must complete successfully a pre-service training program and annual refresher course (p. 4).

(3) *Toledo*

Defendants shall devise selection criteria, in-service training program and psychological tests to assess whether potential employee should work in jail environment (p. 716).

(d) SANITATION

(1) *Jacksonville*

Defendants shall fix all plumbing fixtures (p. 70) and inspect kitchens regularly (p. 80).

(2) *New Orleans*

Implementation of stringent sanitation program ordered (pp. 7–10).

(3) *Toledo*

Inmates shall be organized into work groups for daily cleaning of cells (p. 717); multiple repairs in sanitation system ordered (p. 721).

(e) FOOD SERVICE

(1) *Dallas*

Those handling food must be inspected for communicable diseases (p. 423).

(2) *Jacksonville*

Defendants ordered to overhaul system for preparing and serving food, for assessing nutritional value and for monitoring compliance with health regulations (pp. 78–81).

(3) *New Orleans*

Food must be delivered to cellblocks in closed containers, and professional nutritionist must be consulted (p. 7).

(4) *Toledo*

All components of food service program revamped (p. 716).

(f) RECREATION

(1) *Dallas*

Outdoor exercise program ordered (p. 422).

(2) *Jacksonville*

Recreation program ordered (p. 81).

(3) *New Orleans*

Must develop recreation program aimed at one hour of recreation daily (p. 2).

(g) VOCATIONAL AND EDUCATIONAL REHABILITATION PROGRAMS

(1) *Jacksonville*

Educational, vocational and religious programs ordered (p. 81).

(2) *New Orleans*

Defendants must establish improved educational program (p. 5).

## (h) CLASSIFICATION OF INMATES

### (1) *Dallas*

Jail officials ordered to classify on the basis of status of inmate (p. 423).

### (2) *Jacksonville*

Defendants must separate pre-trial detainees from convicted inmates; numerous other classification criteria delineated (pp. 73–74); medical evaluation upon inmate entry ordered (p. 77).

### (3) *New Orleans*

Defendants must house pre-trial detainees separately from the convicted (p. 5).

### (4) *Toledo*

Eight classification criteria ordered to be adopted for segregating inmates (p. 717).

## (i) MEDICAL FACILITIES

### (1) *Dallas*

Must expand size of hospital ward (p. 422).

### (2) *Jacksonville*

Ordered to make arrangements for use of local hospital space, plus fifteen other ordered changes in medical services and record keeping (pp. 75–78).

### (3) *New Orleans*

New prison hospital will be immediately constructed; medical care must be provided on 24-hour basis (p. 1).

### (4) *Toledo*

Numerous improvements ordered in medical program (p. 718).

## (j) SPECIAL TREATMENT FOR DRUG ADDICTS AND THE MENTALLY ILL

### (1) *Jacksonville*

Drug abuse program to be instigated; psychiatric consultant to evaluate and propose procedures for treating the mentally unstable (pp. 76–78).

### (2) *New Orleans*

Drug abuse program and psychiatric treatment to be arranged with local hospital (p. 1).

## (k) CLOTHING

### (1) *Jacksonville*

Defendants shall furnish clothes free of charge (p. 69).

### (2) *New Orleans*

Defendants shall furnish clothes free of charge to be laundered at least twice weekly (p. 8).

## (*l*) OMBUDSMAN

### (1) *Jacksonville*

Defendants must establish a Permanent Ombudsman, trained in a behavorial science and unassociated with law enforcement, to act as middleman between inmates and the correctional staff (pp. 59–60, 85–86).

### (2) *New Orleans*

Private ombudsman created to investigate inmate complaints (p. 6).

## (m) REPORTING

### (1) *Jacksonville*

Defendants required to file reports to show compliance with every ordered change (throughout opinion).

### (2) *Toledo*

Reports to be submitted on success in implementing ordered changes and decreasing jail population (throughout opinion).

## VI. ORDER

### A. *Pre-Trial Release Agency*

1. Operational control of the Harris County Pre-Trial Release Agency is hereby transferred to the state District Judges of Harris County, Texas. The Commissioners Court retains budgetary approval of the agency.

2. A uniform objective point system for determining release on recognizance shall be developed and ready for use within 15 days.

3. Within 15 days, the Pre-Trial Release Agency shall commence a "crisis

project" to re-evaluate, with the aid of outside and volunteer assistance, all pre-trial detainees. The agency shall inter-view, review and consider for release on recognizance every pre-trial detainee now housed in Harris County detention facilities.

4. The Commissioners Court shall undertake to make arrangements with City of Houston officials for at least two private interview spaces within the City Jail for the exclusive use of the Pre-Trial Release Agency. The Commissioners Court shall negotiate for space which will enable a pre-trial release interviewer to have access to every incoming prisoner after the police booking and identification processes are completed and before the prisoner is placed in a cell.

5. In undertaking to make the above arrangements, the Commissioners Court shall discuss with City of Houston officials the fundamental importance of establishing a procedure whereby the pre-trial release interview is made an integral step in the intake process. That is, such interview must occur prior to the housing of any incoming inmate.

6. The Commissioners Court shall further coordinate efforts immediately with City of Houston officials to install a Pre-Trial Release Agency branch office in the new Municipal Courts Building with minimum office space of 150 square feet.

7. Should the Commissioners Court be unable to arrange with the city suitable accommodations for the agency in the City Jail and Municipal Courts Building, a further hearing thereon shall be conducted promptly by this Court.

8. Within 90 days, the Commissioners Court shall provide at least 2,000 square feet of suitable and appropriately located office space within the county office complex for the exclusive use of the Pre-Trial Release Agency.

9. The Commissioners Court shall obtain from the state District Judges within 60 days a proposed annual budget for the agency which shall be developed upon thorough consultation with the Pre-Trial Release Agency Director and the District Court Manager.

10. The Commissioners Court shall consult with the state District Judges as to adequate staffing and staff salary levels for the Pre-Trial Release Agency.

11. Defendants shall inform fully all accused persons of their right to be interviewed for possible release on recognizance. At no point shall professional bondsmen have preferential access to the accused persons. Placards explaining the right to be interviewed in bold lettering and describing the operations and accessibility of the Pre-Trial Release Agency in both English and Spanish shall be displayed prominently throughout the county detention facilities. The telephone number of the Pre-Trial Release Agency and a brief description of its function shall be posted permanently in the County Jails next to every telephone which is available for inmate use.

The Commissioners Court shall undertake to make arrangements with the city for a similar placard display and telephone listing at the City Jail. Should the Commissioners Court be unable to arrange this with the city, a further hearing thereon shall be conducted promptly by this Court.

12. Four deputies employed in the Criminal Warrants Division of the Sheriff's Department shall have the primary duty to serve arrest warrants on individuals who do not appear as directed after having been released on recognizance.

13. The Commissioners Court shall obtain from the District Court Manager a proposed budget for implementation and maintenance of a unified, computerized inmate "tracking" system to be developed by the District Court Manager upon consultation with other county systems analysts.

14. *See* Appendix A as to Order Nos. 1 thru 13.

### B. The Criminal Justice System

■ 15. Because it is axiomatic that a criminal case moves towards disposition more rapidly once counsel is re-

tained or appointed, the Commissioners Court shall direct the state District Judges through the District Court Manager to obtain from the local bar association a listing of all qualified attorneys to represent indigent defendants. The listing shall be entered in the computer and be available thereafter to provide magistrates with a pool of attorneys from which to appoint counsel on a rotating basis.

■ 16. The Commissioners Court shall establish in Harris County within 90 days at least two special "annex courts" to be maintained until further notice by this Court. These annex courts shall handle "jail" dockets—i. e., only those cases where an accused is incarcerated and awaiting trial—unless and until the average time from arrest to trial in jail cases is reduced to 90 days. When the "90 day" figure is attained, the Commissioners Court shall so notify this Court. The Court will then consider whether the docket system of one or both of the annex courts should be converted to a "trial docket" system.

17. The Commissioners Court shall maintain the District Court Manager and Court Coordinator Program in a fully operational status insofar as it pertains to the issues in this lawsuit until further notice by this Court.

■ 18. The Commissioners Court shall establish immediately a preliminary hearing system in Harris County. Each person charged with an offense against the State of Texas shall be brought before a magistrate, as that term is defined in the Texas Code of Criminal Procedure, as soon as possible but in any event not later than 24 hours after the criminal complaint has been filed or the arrest made.

At this preliminary hearing, the accused shall be represented by counsel unless this right is knowingly and intelligently waived after being thoroughly explained by the magistrate. Any accused who appears without counsel and who desires representation but cannot afford it shall have counsel appointed immedi-

ately, upon a proper showing of indigency, from a list of attorneys approved by the District Judges of Harris County. The magistrate shall determine whether the accused is eligible for release on recognizance.

The magistrate shall schedule an examining trial to be held within 10 days after the preliminary hearing unless such a right is specifically and knowingly waived by an accused and his attorney.

■ 19. "Weekenders" are those persons who are sentenced to serve jail time on weekends only. Defendant Sheriff shall not incarcerate weekenders overnight. The Sheriff shall notify such individuals to appear on Saturday morning for service of jail time. These persons will be released each weekend evening at a reasonable time to be designated by the Sheriff in accordance with other requirements and demands on Department resources and staff. Weekenders shall re-appear at reasonable times similarly designated.

By serving their sentences during the day on Saturdays and Sundays as described above, weekenders shall receive full credit for time served as if they had been in custody continually from Friday evening until Monday morning. This measure, which shall remain in effect until further notice, is designed to aid in reducing overcrowded conditions at the jail and to decrease the amount of processing for weekenders.

■ Weekenders shall be utilized by the Sheriff to assist the Department in performing maintenance, clerical and administrative tasks, especially contributing efforts to the daily cleanup of the jails described hereafter. *See* Part VI. C.21, *infra*.

20. *See* Appendix B as to Order Nos. 15 thru 19.

### C. Jail Conditions

■ 21. County detention facilities shall be thoroughly cleaned and made sanitary on a daily basis by inmates so as to satisfy minimum requirements of

appropriate state health codes. The facilities shall be inspected at least once per month by a County Health Inspector. Maintenance and other interior work at the jails shall also be performed by inmates, including weekenders.

22. Meals shall be served to inmates of the downtown facility in a common dining area for each cellblock. Except where inmates require maximum security segregation, no inmate at either detention facility shall be served a meal in his cell. See Appendix C.

23. As already required by the Consent Judgment, defendants shall provide in the Sheriff's budget for the full-time employment of a dietician or food specialist.

24. Inmates shall be provided a clean change of clothing every day. If adequate clothing is unavailable, the Commissioners Court shall purchase sufficient clothing immediately.

25. All inmates in county detention facilities shall receive one hour of physical exercise outdoors three times per week, weather permitting. See Appendix D.

26. Defendants shall provide in the Sheriff's budget for maintenance of adequate vocational and educational rehabilitation programs, especially at the downtown detention facility. See Appendix E.

27. Defendants shall establish a regular medical "intake" screening process in order to maintain an appropriate level of physical hygiene in the jail. No incoming inmate shall be housed in county detention facilities until he has been medically examined and approved. To this end, defendants shall obtain the voluntary services of qualified physicians or senior medical students so that competent medical assistance is available to ensure the proper medical categorization of inmates. In the event defendants are unable to obtain such voluntary services, they shall provide in the Sheriff's budget for employment of sufficient qualified physicians to perform the duties herein enumerated.

All persons detected at intake as having communicable diseases and other serious medical problems shall be quarantined to be sent immediately to a local hospital or other medical institution for appropriate treatment. Defendants shall coordinate with local public hospitals and medical facilities to establish separate, easily secured wards to facilitate prompt, efficacious treatment of inmate patients at minimum risk to hospital personnel and other hospital occupants.

28. The medical screening program shall also be designed to detect those incoming inmates who suffer from alcoholism and drug abuse and addiction. Defendants shall establish within 90 days a separate Diversion Program for such inmates and shall obtain the services of a consultant who is a specialist in drug and alcohol withdrawal treatment to treat such inmates. Once such program is instituted, such inmates shall be housed in an incarcerative environment specifically designed and equipped for the treatment of withdrawal problems. See Appendix F.

29. The Commissioners Court shall establish immediately an appropriate psychological and psychiatric screening and examination program. Screening and examination shall be conducted upon those presently so incarcerated and upon every incoming inmate. Defendants shall obtain the voluntary services of a consultant who is a specialist in psychiatry and shall further staff the screening program based upon his recommendation. In the event that defendants are unable to obtain such voluntary services, they shall provide in the Sheriff's budget for employment of a qualified psychiatrist to perform the duties herein enumerated.

Also, based upon the consultant's recommendations, the Commissioners Court and the Sheriff shall submit to this Court within 90 days alternative procedures for housing incoming inmates who are certified to have mental or emotional disabilities. The current cellblock area at the downtown detention facility now used for housing inmates suspected of

mental instability shall no longer be used for such purpose, nor shall any such location be established elsewhere within either county detention facility. *See* Appendix G.

■ 30. No pre-trial detainee shall be housed in the same cell or cellblock with any person who has been convicted of a crime and sentenced.

■ 31. Defendants shall provide in the Sheriff's budget for employment of classification officers so that at least one classification officer is on duty at all times when incoming prisoners come into county custody at the downtown facility. Prisoners shall be properly classified and segregated on the basis of criteria to be established by the Sheriff's Department. *See* Appendix H.

■ 32. Defendants shall provide in the Sheriff's budget for adequate training personnel to develop, implement and conduct a training program specifically designed for jail staff personnel. *See* Appendix I.

■ 33. Defendants shall provide in the Sheriff's budget for pay equalization for jail personnel which shall be effected by June 30, 1976, without requiring non-jail personnel within the Sheriff's Department to take salary cuts. Defendants shall further provide for the hiring of a sufficient jail staff based upon a percentage of the total jail population. Under present security needs, sufficient jail staff shall be hired to provide one jailer for every 20 inmates. Inmates shall not act in a supervisory or administrative capacity nor administer disciplinary action over other inmates. *See* Appendix J.

### D. Office of the Ombudsman

■ 34. There shall be an Office of the Ombudsman established to monitor defendants' efforts in complying with this Order and in fulfilling the mandate and requirements of the Consent Judgment. Mr. James Oitzinger, Esq., shall be head of this Office, which will also include Mr. Gerald Birnberg, Esq., as well as other persons, if necessary, to be chosen by Mr. Oitzinger. The appointment of Mr. Oitzinger and Mr. Birnberg to the Office of the Ombudsman shall not preclude their continuing representation of plaintiffs in this lawsuit.

The Ombudsman shall monitor all aspects and operations of the Pre-Trial Release Agency and shall submit periodic reports direct to the Court on the agency's progress. At any time that implementation of agency efforts to reduce jail population is not progressing promptly in accordance with the Court's Order and the Consent Judgment, the Ombudsman shall report to the Court immediately and include recommendations for improvements. The Ombudsman shall similarly monitor and report upon defendants' efforts to improve jail conditions and notify the Court of tardy compliance or lack of compliance with this Order and the Consent Judgment.

### E. Reporting

#### 1. Special Reports

■ 35. Within 14 days and weekly thereafter until the crisis is passed, the Commissioners Court shall, upon consultation with Pre-Trial Release Agency officials, submit a report entitled "Report on Pre-Trial Release Crisis Project For the Week of ___" (stating the Friday of the week for which the report is submitted). This report shall state in detail:

(a) the number of incarcerated persons interviewed by agency personnel;

(b) the percentage of ROR nominees among the total number of persons interviewed;

(c) the number of ROR bonds recommended to the courts by agency personnel;

(d) the number of hours expended by agency personnel in interviewing incarcerated persons; and

(e) the number of ROR bonds written by the courts upon the recommendation of the agency.

#### 2. Monthly Reports

36. Under the Consent Judgment, defendants have assumed the responsibility

for submitting certain monthly reports. Defendants shall continue to bear that responsibility and nothing in this Order shall be construed as superseding that responsibility.

37. In addition to the reports required to be filed under the Consent Judgment, the Commissioners Court shall also file tabular reports on a monthly basis as enumerated below beginning in Order No. 38, with the first such reports to be filed within 30 days.

On a monthly basis beginning in 30 days, the Commissioners Court shall prepare and submit to this Court, in addition to these tabular reports, a graphic illustration of the information reported in each sub-category listed below in Order Nos. 38, 39 and 40. Each graph shall be properly titled and shall occupy a separate sheet so as to be constructed on a large enough scale to permit detailed gradation. Each graph shall reflect the experience for the current reporting period and each of the 12 prior months, if available. Each sub-category which orders a comparison of data shall require only graphic illustration and not a separate line item on a tabular report. Such graphs shall express a percentage comparison with a parenthetical reference to the numbers which represent the numerator and denominator.

All reports shall reflect the source of each datum and the name(s) of the person(s) responsible for compiling the data.

38. A report entitled "Pre-Trial Release Agency Activity" stating in detail statistical analyses of the progress of the Pre-Trial Release Agency. This report should include, but not be limited to, the following information:

(a) total number of persons arrested by city and county law enforcement officials;

(b) number of money bonds underwritten by professional bail bondsmen;

(c) number of persons interviewed by agency personnel by detention facility (City Jail, County Downtown Jail and County Rehabilitation Center);

(d) number of hours expended by agency personnel in interviewing by detention facility;

(e) number of ROR bonds recommended to the courts by agency personnel;

(f) percentage of ROR nominees among the total number of persons interviewed;

(g) number of ROR bonds written by the courts upon the recommendation of the agency;

(h) a comparison of the number of persons recommended by the agency for release on recognizance with the total number of persons interviewed by the agency (graph only);

(i) a comparison of the number of persons who are released on recognizance upon recommendation by the Pre-Trial Release Agency with the number of persons who are released after posting a money bond (graph only);

(j) number of personal recognizance bonds written upon initiation by sources other than the Pre-Trial Release Agency;

(k) a numerical analysis of the reasons for refusing to recommend those who do not qualify for release on recognizance;

(*l*) number of persons interviewed by the Pre-Trial Release Agency who are not recommended for release on recognizance because of the inability of agency personnel to verify pertinent questionnaire information;

(m) a comparison of the number of non-recommended persons with unverifiable information with the total number of persons interviewed by the Pre-Trial Release Agency (graph only);

(n) number of personal bond forfeitures, the number of Sheriff's personnel and the number of hours expended in bringing forfeiture subjects to custody, an analysis by category of the reasons for forfeiture and the percentage of forfeiture subjects who are restored upon re-consideration by the District Judges;

(*o*) a comparison of the number of personal bond forfeitures with the number of persons being released on recognizance (graph only);

(p) a comparison of the number of persons whose forfeited bond is restored with the number of personal bond forfeitures (graph only); and

(q) such other data as the District Judges, the District Court Manager or the agency may deem appropriate to inform the Court fully of the status and effectiveness of the Pre-Trial Release Program.

39. A report entitled "The Criminal Justice System and Incarceration" on the operation of the criminal justice system as it affects the length of an inmate's incarceration, as well as all efforts being made to decrease the time span from arrest to trial. This report should particularly include, but not be limited to, information on the following:

(a) average length of time from arrest to disposition by class of offense and status and defendant (jail or bail);

(b) total number of arrested persons who are indigent (i. e., who would otherwise qualify under the law for court-appointed counsel);

(c) percentage of indigency cases in which counsel is appointed through the listing approved by the state District Judges;

(d) average number of days from arrest to appointment of counsel for indigent inmates;

(e) percentage of indigency cases in which the inmate is not represented by counsel until arraignment;

(f) number of appointments made by Municipal Judges;

(g) number of appointments made by Justices of the Peace;

(h) number of examining trials conducted per felony complaint filed by status of defendant and court (Justice of the Peace, Municipal Judge, etc.);

(i) number of waivers of indictment by indigent defendants who are represented by appointed counsel;

(j) number of new charges filed by the District Attorney by class of offense;

(k) number of cases pending by class of offense and status of defendant (jail or bail);

(l) number of cases disposed of before trial by class of offense, status of defendant and court;

(m) a comparison of the disposition without trial of cases involving persons represented by appointed counsel with the disposition through trial on the merits of such cases (graph only);

(n) average number of days from arrest to trial for incarcerated inmates;

(o) average number of days from arraignment to trial for incarcerated inmates;

(p) number of cases disposed of (sentence, probation, acquittal, dismissal) by class of offense, status of defendant and court;

(q) number of misdemeanor cases filed and/or tried by Justices of the Peace and Judges of County Criminal Courts-at-Law;

(r) number of incarcerated pre-trial misdemeanants;

(s) number of incarcerated, convicted misdemeanants;

(t) number of arrested persons being incarcerated in each of the following: diversion programs; halfway houses; and hospitals (as mental or other medical patients awaiting trial);

(u) statistical analysis of the docket experience of the special annex courts;

(v) a comparison of the total number of cases tried by both annex courts and regular courts with the total number of persons arrested and charged with committing a felony offense (graph only);

(w) number of incarcerated persons convicted of a felony, sentenced to a term in the penitentiary of greater than 15 years and awaiting appeal; and

(x) such other information as may be available and useful to this Court in keeping informed of the status of the Harris County Criminal Justice System.

40. A report entitled "Status of Jail Conditions" on the status of jail conditions including the results of the Health Inspector's monthly tour of each county detention facility. Such a report shall further include, but not be limited to, the following information (for sub-cate-

gories which order a "description", no graphic illustration is necessary):

(a) number of inmates incarcerated in each of the county detention facilities;

(b) ratio of inmates to guards at each county detention facility;

(c) number of inmates incarcerated in county detention facilities who are being held at the request of another jurisdiction;

(d) number of incoming inmates per month;

(e) average number of incoming inmates during each day of the week;

(f) average number of incoming inmates during each hour of the day;

(g) percentage of inmates receiving a fresh change of clothing each day;

(h) percentage of incoming inmates being screened at intake medically and psychiatrically;

(i) average daily hours of the operation of the downtown medical intake screening program;

(j) number of persons participating daily in the intake medical screening by category of worker (Sheriff's Deputy, nurse, physician, volunteer assistant, senior medical student, psychiatrist, etc.) and the average total hours worked daily by persons in each such category;

(k) number of persons who daily attend to prisoners (alcoholic, drug addict, mentally unstable, all physically ill persons) being housed in outside medical facilities by category (see *j* above for listing of categories) and the average total hours worked daily by each such attendant;

(*l*) number of persons detected as suffering from alcoholism, drug abuse, or communicable diseases;

(m) number of persons detected as having mental instability;

(n) total number of persons transferred to outside facilities for medical treatment by category (medical illness, psychiatric illness, alcoholism and drug abuse, etc.);

(o) a comparison of the number of inmates having medical problems, mental instability, alcoholism or drug addiction with the total number of medically screened inmates (graph only);

(p) kinds and locations of outside facilities being used to house such inmates (no graph);

(q) number of inmates requesting and receiving dental care during the reporting period;

(r) number of inmates participating in educational and vocational programs as well as the kinds of courses offered and the number of hours per week each is offered;

(s) number of hours of outdoor recreation per inmate per week;

(t) hours during the day when recreation is provided (no graph);

(u) average number of inmates at downtown facility receiving recreation at a time;

(v) a description of the daily routine established for the serving of hot meals in dayroom areas (no graph);

(w) a description of procedures employed since the last reporting period to improve sanitation in cellblocks and dayroom areas (no graph); and

(x) such other information as may be available and useful to this Court in keeping informed of the status of conditions of Harris County detention facilities.

41. A report entitled "The Computer Tracking System" on the progress of establishing the computerized, intergovernmental tracking system. This report shall describe the overall design and goals of the tracking system, setting out in detail the expected start-up dates for each phase of implementation.

42. A description of the classification system utilized by the Sheriff's Department. Such report shall be entitled "Status of the Sheriff's Classification System" and shall include: the categories into which inmates are classified; the average daily number of inmates so classified by facility (downtown or Rehabilitation Center); and the total number of inmates so classified monthly by facility.

43. A description of the weekly routine for processing weekenders entitled "Report on Weekenders". Such report shall include, but not be limited to, the following information:

(a) average term served by weekenders;

(b) average number of weekenders incarcerated during the reporting period;

(c) average daily length of residence for a weekender during his period of incarceration;

(d) uses to which weekenders are put; and

(e) such other information as may be available and useful in informing this Court fully of the processing of weekenders.

44. A description of procedures employed since the last reporting period for the training of jail staff personnel. Such report shall be entitled "Training of Jail Staff Personnel" and shall include, but not be limited to, the following information:

(a) number of training classes offered, source and description of curriculum used for each class and number of hours training per week;

(b) names and titles of personnel hired to conduct the training classes;

(c) number of trainees enrolled in each class;

(d) length of course of study;

(e) number of trainees successfully completing each class;

(f) availability and types of job-related courses for off-duty training, as well as number of employees enrolled (if courses are available) and kind of incentive program devised to encourage enrollment; and

(g) such other information as may be available and useful in informing this Court fully of the methods for training jail staff personnel.

## F. Conclusion

45. Defendants shall continue to be under a duty to comply fully with the mandate and specific requirements of the February 4 Consent Judgment. Nothing contained in this Order supersedes that decree, and it remains in full force and effect.

## APPENDIX A: PRE–TRIAL RELEASE

### 1. The Pre-Trial Release Agency Budget

The Commissioners Court continues to have primary responsibility for funding the operation of the Pre-Trial Release Agency pursuant to state law. Tex.Rev. Civ.Stat.Ann. art. 2372p–2. Transferring operational control of the agency is feasible within this statutory framework, as is transferring to the District Judges the primary responsibility for evaluating agency personnel and budgetary needs.

### 2. Staffing of the Pre-Trial Release Agency

In keeping with the general emphasis on a simplified approach to release on recognizance, the Court suggests increased flexibility in the staffing of agency interviewing and clerical personnel. While several staff levels have been recommended such as the one submitted by Sheriff Heard, see PX–41, no one fixed staff level may be appropriate. However, the evidence reveals that a minimum of ten persons with appropriate additional clerical and administrative support should be employed as interviewers. All regular agency staff members should be compensated adequately to minimize high turnover of personnel. The feasibility of employing volunteers should be explored, especially the employment for course credit of law students from area law schools. Necessary staff must be provided so that the agency can operate on a 24-hour per day basis, seven days per week.

### 3. An Objective Point System for Evaluation of Release on Recognizance

■ The District Judges in coordination with the agency director and the District Court Manager shall design a uniform objective point system to be

used. The objective point system should be designed with a view towards reducing to a minimum the refusing of "PR" bonds on "hunches." This objective approach should also replace previous reliance on an arbitrary schedule of cash bonds for various types of offenses.

 Dangerous persons should no longer be released solely because they can afford to pay a money bond. The new pre-trial release system should operate to make the community safer and to eliminate arbitrary bond decisions by shifting the focus of the evaluation scheme from an absolute reliance upon ability to pay and type of offense charged to two more relevant criteria: safety of the community if the person is released; and likelihood of the person's appearance in court if released on recognizance.

## 4. Liaison Between the Judges and the Pre-Trial Release Agency

### a. Design of the Objective Point System Form Questionnaire

The District Court Manager shall act as liaison between the judiciary and the agency and shall have primary reporting responsibility as representative of the District Judges. In coordination with the director of the agency, other county computer analysts and Lieutenant James White of the Sheriff's Department, and in conformity with certain broad guidelines to be set out by the District Judges, the District Court Manager should also have responsibility for designing the form questionnaire to be used by agency interviewers when preparing the objective evaluation of an interviewee. The form should be compatible as a document for computer scanning and should be designed with the novice interviewer in mind so that training in the use of the form can be simplified and streamlined to the greatest degree possible.[8]

### b. The Pre-Trial Release Crisis Project

Credible testimony at the September 16 hearing demonstrated that a minimum of 500 pre-trial detainees presently incarcerated in county detention facilities were eligible for release on recognizance applying even the most stringent standards of review. As a starting point, the crisis project should utilize the newly-instituted, uniform objective point system procedures to focus upon verifying the eligibility of these inmates for prompt release on recognizance and bringing this eligibility to the immediate attention of the courts. As liaison between the courts and the Pre-Trial Release Agency, the District Court Manager should coordinate priority handling of these inmates with the District Judges to ensure their prompt, orderly consideration for release.

Projecting from this starting point, the agency should then meticulously review all pre-trial detainees under the uniform objective point system, beginning with detainees who have served the longest period of confinement. Significant savings to taxpayers can be realized from thorough project efforts by the agency. This factor, taken together with current conditions in the jail, dictates that the judiciary, the agency director and the District Court Manager institute the Pre-Trial Release Crisis Project as a first priority.

## 5. Providing Adequate Facilities for the Pre-Trial Release Agency

The City of Houston Jail, which contributes more than 80 percent of the "inventory" to county detention facilities, is the doorway to entry into the county system. Everyone who testified at the September 16 hearing about the operation of the Pre-Trial Release Agency agreed that the agency must be given increased access to incoming prisoners at

---

8. An example of the kind of substantive material which it is helpful to include in a questionnaire of this sort can be found in an article which discusses the operation of the Dallas County Pre-Trial Release Agency. See Bogomolny & Gaus, An Evaluation of the Dallas Pre-Trial Release Project, 26 S.W.L.J. 510, 536 n.38 (1972).

the City Jail. This access must also be private so that the interviewer can transcribe all confidential information which the agency requires. The Commissioners Court should explore with City of Houston officials the availability of this space within the City Jail for the construction of at least two private interview booths to ensure that the interview takes place before the interviewee is transferred up to his or her cell. The Commissioners Court shall also ensure that similar space is made available to the Pre-Trial Release Agency in the downtown County Jail.

The interviewer's quick verification of gathered information is essential to the proper functioning of the Pre-Trial Release Agency. Given the apparent lack of space in the City Jail for office space in addition to interview booths, the Commissioners Court should negotiate with City of Houston officials to obtain a small office in the new Municipal Courts Building which can be utilized by the Pre-Trial Release Agency to verify information gathered at the City Jail. Moreover, such an office would place the agency in close proximity to the District Attorney's Intake Office and the courtrooms where many of the preliminary hearings will be conducted.

Central headquarters for the agency should continue to be located in the county office building. However, given the present crowded facilities and the future increase in agency personnel, the central offices will need to be expanded so that the agency has the exclusive use of at least 2,000 square feet of office space in the county office complex.

### 6. The Computer Tracking System

#### a. Simple Design for Broad-Based Usage

The installation of a centralized computer system will streamline local criminal justice procedures, including the Pre-Trial Release Program. The multi-tiered local government structure which presently exists in Harris County has resulted in an inefficient duplication of infor-

mation. A computerized record-keeping system would do away with this unneeded repetition in information-gathering, allow for speedier retrieval of data and provide a better means for long-term storage. The system should be designed to provide current ("real-time") information about an inmate's status within the criminal justice system at any given point in time.

Obviously, for such a computer system to function most efficiently, its use must be activated at that point where information is first gathered. Since information is usually first obtained by a Houston City Police desk sergeant at the booking desk in the City Jail, the Commissioners Court should discuss with City of Houston officials the implementation of an all-encompassing computer network which would be available for use by all entities within the criminal justice system from the moment a prisoner enters the system. The system should therefore be designed for availability to all of the many county and city administrative, judicial and law enforcement agencies which process at one time or another persons who are incarcerated at county detention facilities.

Simplicity should be emphasized in the design of the system. The District Court Manager and his selected computer consultants should coordinate with all potential users of the system—i. e., all those agencies or governmental entities which have an effect on the jail population—to ensure that all of their needs are met while the system is at the same time being streamlined. Explanatory manuals should be prepared for system users.

#### b. Capabilities of the System

The unified system should commence operation at the moment of an inmate's first booking. Whether a Houston City Police desk sergeant or a Harris County Sheriff's desk sergeant is the first to transcribe information about a prisoner, the information should be recorded in a format and within a context utilizable by all concerned. The documents used for taking this information should be com-

patible with computer scanning equipment.

Once the information is recorded from the point at which an inmate first enters into custody, the information there transcribed should thereafter be accessible through the use of remote data terminals in the offices of all bona fide users without the need for additional information-gathering. Should additional information about an inmate be required which has not previously been recorded, the system should afford users the capability of utilizing their remote data terminals for recording such information. The system should also provide the capability of reporting summary information such as that required to be submitted by this Court in Part VI.E. of this Order.

For example, the first information which a Pre-Trial Release Agency interviewer requires is likely to be recorded by City Police officials at their booking desk. Upon the immediate recording of this information on a document suitable for reading into the computer tracking system, the introductory information can be immediately entered into the computer, can be stored for prompt access by an agency interviewer and can be mechanically transcribed on an appropriate questionnaire form for subsequent completion by the interviewer. The information can also be mechanically transcribed on the appropriate forms for use by the District Attorney's Intake Office should the decision be made to charge the arrested person.

Under the unified computer tracking system, transcription at the booking desk eliminates the need for additional transcription when an accused is sent to the fourth floor for his mug shot photograph and check on his prior criminal record. These tasks will have already either been performed or in progress by the time the accused reaches the fourth floor.

### c. Ensuring the Appearance of ROR Defendants

#### (1) Post Card Reminders

A dominant thread in the fabric of the Pre-Trial Release Agency is its credibility. The judiciary must be able to rely upon the agency and counsel so that confidence is built in the agency's ability to ensure an accused's timely appearance in court. The computer tracking system must therefore provide the Pre-Trial Release Agency with one or more means for ensuring timely appearance.

■ One means is a daily summary listing of those defendants who have qualified for release on recognizance and are scheduled to appear in court soon. Post card reminders should be printed and addressed by computer and mailed at least one week in advance of a setting date. The notice should require the defendant's appearance in the agency's county office one hour before the scheduled setting. In the interim between date of release and date of court setting, both the agency and defendant's counsel should be charged with the responsibility for ensuring the defendant's appearance in court at the proper time.

The post card reminder system in combination with a required appearance in the agency's county office one hour prior to the scheduled court setting alerts agency personnel about tardy defendants. Alternative means of ensuring a defendant's appearance in court can also be promulgated if necessary.

#### (2) Retrieval of ROR Bond Forfeitures

The tracking system should generate daily summary reports of ROR bond forfeitures to the Sheriff's Department. Utilizing specially designated deputies to serve arrest warrants on individuals who do not appear as directed, the Sheriff should ensure that such individuals are retrieved immediately and that successful retrievals are promptly recorded into the tracking system to alert both the court and the agency that the defendant is in custody. While incarcerated and awaiting his forfeiture hearing, the defendant should not be housed with the hard-core criminal population.

#### (3) ROR Bond Forfeiture Hearing

■ The court should set a forfeiture hearing promptly upon being notified of

the defendant's retrieval. At the hearing, the defendant has the burden of demonstrating why the ROR bond should not be forfeited. Pre-Trial Release Agency personnel should be available upon request of counsel at the forfeiture hearing and will be prepared to assist the defendant and his counsel in meeting the burden, where appropriate.

### d. Computer Access for the Courts

Remote data terminals should also be available for the district courts and magistrates, since their actions influence whether, and the extent to which, an accused person is to be incarcerated. With regard to pre-trial release, a magistrate or judge should be able to obtain pertinent information immediately via a print-out from the computer. Inquiries addressed to the agency representative in court during a preliminary hearing or arraignment are therefore minimized, with the agency interviewer presenting only that subjective information which the court or magistrate deems appropriate for further amplification.

### 7. Access of the Pre-Trial Release Agency to Incoming Prisoners

Prompt access to incoming inmates by a sufficient staff of Pre-Trial Release Agency interviewers equipped with streamlined, objective form questionnaires is crucial to smooth, efficient functioning of the criminal justice system. If it becomes apparent that defendants are not successful in establishing an effective, efficient Pre-Trial Release Program, the Court will not hesitate to order the expenditure of necessary funds to obtain the technical expertise and assistance of Vera Foundation consultants to set up such a program immediately.

Unlike the professional bonding system, a Pre-Trial Release Program cannot function without contact between the interviewer and the prisoner. Prompt access of the interviewer to the prisoner is therefore fundamental to the success of the program and proper initiation of the criminal justice system.

The Court does not intend by this Order to deprive any arrested person of the opportunity to seek bail through a professional bail bondsman. However, the Court also does not intend for the present system to continue whereby arrested persons are denied the possibility of release on recognizance solely because of ability to pay a cash bond. Under no circumstances are defendants to permit Pre-Trial Release Agency efforts to be superseded at the behest or by the actions of professional bail bondsmen.

### APPENDIX B: THE CRIMINAL JUSTICE SYSTEM

#### 1. Introduction

The Court has previously outlined the need to have Pre-Trial Release Agency interviewers in close proximity to prisoners incoming at the City Jail. The above Order in Part VI.B. further states the well-recognized significance of having counsel appointed for indigent defendants as soon after arrest as possible.

The following chronology underscores these needs and also points up one means by which the several interests of the criminal justice system—enforcement, prosecution, defense, justice and proper incarceration—can interact in harmony with each other and all be served at the same time.

The computer tracking system must support and be accessible to all participating agencies, as well as all magistrates who must decide the question of release on recognizance. Remote data terminals should be provided for each of these agencies and also for the clerk of the magistrate's court to facilitate prompt access of each person to salient information.

#### 2. Suggested Chronology

A composite of the evidence adduced at the September 16 hearing suggests that the criminal justice system could

work in the following manner in the first 24 hours after a person's arrest.[9]

The suggested chronology is designed to illustrate the desirable functioning of the criminal justice system in proper interaction and to stimulate rather than suppress creative thought for other possible processes.

(a) The prisoner is brought to the booking desk of the City Jail. An offense report is prepared by the arresting officer, and intake information is recorded about the prisoner. Via computer, he is assigned a sequential number for invoicing of all persons who are arrested or incarcerated within the geographical boundaries of the county.

(b) Upon completion of the booking, the prisoner is then photographed and proceeds to the fourth floor for fingerprinting[10] and further intake processing.

(c) The prisoner then proceeds to an interview space to be interviewed by a staff member of the Pre-Trial Release Agency. He is then taken to a holding area to await a preliminary hearing.

(d) In the meantime, the arresting officer has proceeded to the District Attorney's Intake Office to inform the prosecutor of the arrest. Already supplied with many of the details of the offense report which were recorded on the computer, the prosecutor has begun evaluation of the case by the time the officer arrives. After discussion with the officer, the prosecutor decides whether to file charges. If no charges are to be filed, the prosecutor should so note this fact in the computer tracking system promptly so that a message can be mechanically transmitted immediately to the jailer who has custody of the subject. Upon receipt of this message, the jailer should promptly discharge the subject from custody.

(e) While the decision is to charge is being made, the agency interviewer is transmitting unofficial (i. e., unverified) information into the computer to complete a preliminary objective evaluation of the subject's eligibility for release on recognizance.

(f) If charges are filed, the prosecutor enters into the computer whatever information is not already recorded and signals the computer to commence the program for preparing the multi-copy charge.

(g) With the mechanism of the county criminal justice system now in progress, identifying numbers can be assigned to the subject prisoner, such as a court docket number. A check also can be made to ascertain whether other charges or warrants are currently pending or outstanding against him, or whether he is currently on probation or under other court-ordered supervision.

(h) Once the decision to charge is made, staff members in the Pre-Trial Release Agency office are alerted to commence verifying appropriate information transcribed on the form. Such verification should be conducted with appropriate concern for an individual's

9. The described chronology presumes that first contact with the inmate will come, as it does in 80 percent of the cases, at the Houston City Jail. Corresponding intake measures are applicable to those situations where a prisoner enters the system initially at the downtown County Jail.

10. As a matter of course, local jailers fingerprint each incoming arrest subject for identification purposes and for ascertaining through the Federal Bureau of Investigation whether the subject has a prior criminal record and any outstanding arrest warrants against him from other jurisdictions.

The subject's fingerprints can also provide a useful indexing tool for use by the Harris County computer tracking system. Fingerprints can be reduced to a numerical code cognizable by computer which is unique for each individual subject. This index code can then be recorded to accompany the other general background information transcribed about the subject.

In the course of subsequent processing by such users as the District Attorney, District Court Manager, or Pre-Trial Release Agency interviewer, this index code can be referenced to "inquire" of the computer tracking system memory whether other cases, other charges, or other local arrest warrants are presently pending against the subject.

right to privacy and confidential treatment of sensitive matters.

(i) Once the decision to charge is made, the clerk of the nearest magistrate, typically a City of Houston Municipal Judge, should be alerted to the potential need to conduct a preliminary hearing. Information will have already been recorded by the agency interviewer which will reflect whether the subject has retained an attorney or whether, if he has not, he asserts that he is unable to afford one. By pre-arranged selection from the pool of readily available attorneys previously approved for listing by the District Judges, an attorney is notified to be available to take the next case where appointed counsel will be required.

(j) Once pre-trial release information has been verified and so noted on the computer, the preliminary hearing is ready to proceed.

(k) The subject is taken from the holding area to a nearby courtroom for a hearing with a magistrate on duty. The magistrate first ascertains the situation with counsel and appoints the notified counsel if appropriate.

(l) The magistrate then decides the subject's eligibility for release on recognizance. The courtroom remote data terminal provides him with a printout of all pertinent data, including objective pre-trial release evaluation and prior criminal history. The agency interviewer is also available to describe the verification process and make a recommendation in close cases, if requested.

(m) If the magistrate decides to approve the ROR bond recommended by the agency, or to grant one on his own evaluation, the subject and his counsel, if present, then declare whether they wish to assert their right to an examining trial. At the conclusion of the preliminary hearing, the agency interviewer then informs the subject of the appropriate check-in procedures on the day of any scheduled court appearance. The subject is then free to leave or may remain with his attorney to discuss his case, or discuss with counsel and the prosecutor the possibility of alternative disposition of the case.

(n) If the bond is not approved, that fact is noted in the tracking system, and the subject is returned to a cell to await transfer.

(o) Transfer to the downtown County Jail is accomplished more economically because the tracking system will reflect at any time those persons awaiting transfer. The book desk stop at the County Jail is practically eliminated because most of the data about a subject required to be taken by the Sheriff has already been recorded. The subject can proceed directly to the medical screening and classification procedures.

### 3. Access to Counsel

#### a. Ensuring Confidential Consultation

Inmates' access to counsel is now not adequately provided for at county detention facilities. Space limitations either preclude confidential consultation or prevent sufficient consultation. Certain private booths recently have been made available for attorney-client interviews, and these have enhanced confidential communication. However, there are still not sufficient rooms designated for attorney-client conferences so as to permit adequate access.

This is especially true on the date of an inmate's scheduled court appearance. Inmates are placed in a holding cell adjacent to the courts at 4:00 a. m. for court settings which do not commence until 9:00 a. m. Should an attorney wish to consult with his client before the court setting, the interview takes place in an adjacent holdover cell.

■ Defendants should allocate sufficient resources and manpower, consonant with security needs, to make client contact possible at all reasonable times and with proper regard for confidential communication. Defendants should also coordinate with the state District Judges to provide interview rooms in the court building so that on the day of a court setting, counsel and clients can confer in

private. Finally, upon consultation with the judiciary and the District Court Manager, defendants should utilize the computer tracking system to develop a plan for trafficking inmates to court efficaciously to eliminate the five-hour pre-hearing waiting period each morning.

### b. Ensuring Adequate Representation

All indigents who do not knowingly and willingly waive their right to counsel should be represented by an attorney. The Commissioners Court is authorized under state law to provide for legal services in addition to court-appointed counsel. Tex.Rev.Civ.Stat.Ann. art. 2372p–1. If monthly reports demonstrate that the system of appointing counsel is not providing adequate representation to indigent defendants, the Court shall explore the propriety of ordering the establishment of a county public defender's office.

### 4. Weekenders

Weekenders should be held in custody only on Saturday and Sunday and only for so long as they are needed to assist the Sheriff and his staff with designated weekend chores. Weekenders should not be required to be re-processed at intake each weekend. A "check-in" routine should be devised through the use of the computer tracking system. After a weekender has been processed at intake at the beginning of his first weekend stay, he should thereafter be issued some sort of identification card or reference to permit rapid checking of his attendance on all subsequent weekends when his attendance is required. The computer tracking system should be designed to inform the Sheriff every Friday of the list of weekenders expected to return for service of jail time or be processed for initial intake the next day. In this manner, the Sheriff can allocate appropriate personnel and designate appropriate tasks for the supervision and proper utilization of weekenders.

Weekenders who are detected at the initial intake medical screening to be suffering from a communicable disease, alcoholism, drug abuse, mental instability or some other serious medical problem should not be housed with other inmates. The Sheriff should notify the court of their inability to serve in jail. The court can then determine whether they should receive proper medical or diversionary treatment while in custody, or can have service of their sentences deferred until such time as they are well enough to serve.

### APPENDIX C: SERVING OF MEALS

The Court recognizes that meals at the downtown County Jail are presently served to inmates in their individual cells for several reasons, including security, lack of manpower and ease of administration. However, the savings to defendants by serving food in the present manner are outweighed by the high cost of sanitation maintenance and the indignity of being required to eat on one's bed in the presence of a toilet.

Therefore, meals should be served in a common dining area, typically a cellblock dayroom. Because several persons occupy the dayroom permanently and others occupy it during the day while watching television, meals will need to be served in shifts in a manner which does not jeopardize security.

### APPENDIX D: PHYSICAL EXERCISE AND RECREATION FOR INMATES

As with the serving of meals, the Court recognizes the strain on available manpower, lack of appropriate recreational space at the downtown County Jail and potential threat to security which a group exercise period poses. However, an absolute denial of such exercise violates even the most basic legal standards of jail operation.

Defendants should ensure that all inmates exercise and that at any one time exercise is provided for a prescribed number of inmates commensurate with available manpower for monitoring the activity. Additionally, defendants should provide exercise and recreational equip-

ment. Necessarily, defendants may require the sacrifice of this privilege by inmates who fail to abide by reasonable regulations.

## APPENDIX E: VOCATIONAL AND EDUCATIONAL PROGRAMS

Defendants should continue to solicit such volunteers from local educational institutions as have previously donated time, efforts, equipment and teaching materials to further the education of inmates. Formal, regularly scheduled, adequately staffed and properly funded classes should be conducted on a regular basis.

The additional expense to make such programs available is vastly outweighed by the savings to be realized by the taxpayers from the proven effectiveness of such programs in reducing the rate of recidivism. Volunteers should be compensated for time and effort, and equipment should be purchased by defendants to enhance creation of a proper learning atmosphere. All inmates should be afforded the opportunity to attend regularly conducted classes in proper classroom areas.

## APPENDIX F: DIVERSIONARY TREATMENT OF ALCOHOLICS AND DRUG ADDICTS

■ Alcoholics and drug addicts should not be permitted to go through withdrawal without proper medical attention and care in a suitably equipped medical facility. Further, they should not thereafter be incarcerated in the downtown County Jail. Rather, they should be diverted to incarceration at the Harris County Rehabilitation Center or other available sites around the county under the guidance of properly trained personnel and the strict supervision of the district courts.

Several programs, both state and federal, now exist which seek such a solution, and defendants shall consult persons or agencies having extensive experience in this area to facilitate prompt establishment of this diversion program.

Prompt, thorough treatment of these illnesses in a proper environment may succeed in producing their cure and eliminate the need for repeated journeys through the criminal justice system.

## APPENDIX G: PSYCHIATRIC TREATMENT OF INMATES

Contact should be made with appropriate officials of the Harris County Medical Society to obtain the services of psychiatrists and psychologists who will consult and staff the screening program. It is to be hoped that voluntary contributions can be made to this program by the medical community.

Inmates should be properly examined and classified psychiatrically. If mental instability is accurately detected, an inmate should be housed in a proper medical facility specifically designed to treat problems of this nature.

Potentially grave security problems are presented by housing mentally unstable inmates at an outside psychiatric clinic or psychiatric ward of a local hospital. Indeed, previous concern expressed by hospital administrators for the security and safety of hospital personnel and occupants has prompted defendants to house such inmates in detention facilities in the current manner. However, with sufficient allocation of resources, defendants can re-design and man safe, secure medical facilities so that mentally unstable inmates can begin to receive proper treatment. The expense of housing such inmates in a secured medical environment will be outweighed by the savings which taxpayers will realize from reduced security costs at the jail, by the removal of potentially explosive elements from within the jail population, and by the resultant humane treatment of the mentally ill.

## APPENDIX H: CLASSIFICATION OF INMATES

■ Three basic criteria are relevant for consideration in properly joining inmates together in a common cell:

(a) danger which an inmate's presence poses to others based on his prior crimi-

nal record, pattern of violent behavior and other pertinent data;

(b) danger which an inmate's presence poses to himself from others; and

(c) likelihood of an inmate's successful rehabilitation by proper placement. Other significant criteria should be developed by the Sheriff upon thorough consultation with the staff psychiatrist or psychologist and the Classification Officer.

Exposure to persons with extensive criminal backgrounds can harm first offenders and other inmates who enter the system with little propensity for future criminal conduct and are prime candidates for rehabilitation. Moreover, the haphazard intermixing of the veteran inmate and the newcomer is more costly to the taxpayers because it impedes any subsequent efforts at rehabilitation which a criminal justice system might attempt. Additionally, the present classification system increases the possibility of inmate violence and the danger to jail personnel as well as to jail visitors, thereby escalating the need to allocate funds for security and a disproportionate amount of limited manpower to attend to security.

### APPENDIX I: TRAINING OF SHERIFF'S PERSONNEL

As has been ordered under similar circumstances, see Jones v. Wittenberg, supra, 330 F.Supp. at 716, the Court recommends that defendants consider utilizing some type of instruction course to train jail personnel adequately. One possibility is the use of the programmed instruction course prepared by the United States Bureau of Prisons for jail officers and jail administrators. Such a course should be taught by a trained member of the Sheriff's staff or an outsider versed in such instruction. Successful completion of this course should be a requirement for employment or continued employment in the jail.

In addition, the defendant Sheriff should develop a comprehensive plan for the selection and in-service training of jail personnel. At a minimum, this training should include programmed instruction of the kind described above as well as psychological examinations designed to disclose any personality defects which would interfere with proper functioning as a jailer. Defendants should investigate the availability of job-related courses offered in community institutions and should arrange for Sheriff's Department personnel to take such courses at county expense. Off-duty training which will significantly contribute to a jailer's ability and improve his job performance should be compensated by small salary increases.

### APPENDIX J: ADEQUATE JAIL STAFF

The evidence adduced at the September 16 hearing reveals a wide disparity between the ratio of jail guards to inmates which presently exists (one guard for every thirty (30) inmates) and the ratio considered necessary by the Sheriff to provide adequate security (one guard for every ten (10) inmates). The uncontradicted evidence establishes that a one-to-thirty ratio is inadequate for jail security purposes. In the absence of evidence to the contrary, a ratio of one jail guard for each twenty (20) inmates will be viewed as appropriate at the present time. Should the Sheriff or the Commissioners Court conclude upon thorough evaluation after 120 days that an adjustment is necessary in the ordered ratio, either defendant should petition the Court for an adjustment accompanied by supporting documentation demonstrating the need for such adjustment.

It should be noted that under the Court's formula a reduction of the jail population will produce a corresponding decrease in the dollar outlay necessary to fund an adequate staff level in the jail.